# United States Court of Appeals

### For the Eighth Circuit

_____

No. 18-1628

_____

Park Irmat Drug Corp.

*Plaintiff - Appellant*

v.

Express Scripts Holding Company; Express Scripts, Inc.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 26, 2018
Filed: December 12, 2018

_____

Before WOLLMAN, KELLY, and ERICKSON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Park Irmat Drug Corporation (Irmat) brought suit against Express Scripts Holding Company and Express Scripts, Inc. (Express Scripts), alleging various contract claims, a promissory estoppel claim, and violations of federal antitrust laws

and state Any Willing Provider laws. The district court[1] dismissed Irmat's complaint for failure to state a claim. We affirm.

## I.

Express Scripts is the largest pharmacy benefits manager (PBM) in the United States. A PBM is a third-party administrator of prescription drug programs. PBMs process and pay prescription drug claims made by pharmacies and patients. PBMs also negotiate drug discounts with pharmaceutical manufacturers, handle pharmacy benefits for health plans and self-insured entities, and develop lists of drugs that are approved for reimbursement. A patient's health insurance plan chooses which PBM covers their drug-related expenses. Express Scripts and another PBM, CVS Health (CVS), account for 65% of the PBM market.

PBMs create networks of pharmacies in which PBM members can receive their prescription pharmaceuticals at covered, discounted rates. To be successful, independent pharmacies must participate in the largest PBM networks. These independent pharmacies contract with PBMs either directly or through an agent such as a Pharmacy Services Administrative Organization (PSAO). Ninety-seven percent of retail pharmacies in the United States participate in Express Scripts's pharmacy network.

Express Scripts also operates a mail-order pharmacy that fills prescriptions by mail nationwide. It is the only mail-order pharmacy allowed in Express Scripts's PBM network. According to Irmat, PBMs that own mail-order pharmacies dominate the mail-order pharmacy service industry. Nevertheless, independent pharmacies,

---

[1]The Honorable Ronnie L. White, United States District Judge for the Eastern District of Missouri.

like Irmat, have been able to successfully provide mail-order pharmacy services to customers in the United States.

Irmat is a New York-based, independent pharmacy located in midtown Manhattan. It opened in 1978. For many years, Irmat was a successful retail pharmacy that filled and sold prescriptions via its storefront location. In 2013, Irmat began focusing on dermatological pharmaceuticals. It entered into a patient assistance program with dermatological drug manufacturers for pharmaceuticals that often had no generic equivalent. Under the programs, the manufacturers would pay a portion of a patient's insurance co-payment to Irmat. Because of its participation in these programs, Irmat expanded its business into a nationwide mail-order pharmacy and increased its staff from twenty employees to 208 employees.

Irmat joined Express Scripts's PBM network in 2012 through AccessHealth, a PSAO, and gained access to more than 100 other PBMs. In October 2014, Express Scripts sent Irmat a Network Provider Agreement (the agreement) requiring that Irmat sign or risk termination from its network. The agreement required Irmat to meet the definition of a "retail provider," which was defined as a pharmacy "that primarily fills and sells prescriptions via a retail, storefront location" and that "shall not include mail order" pharmacies. The agreement also included recredentialing requirements whereby a retail provider must disclose updated information to Express Scripts. Failure to comply with the recredentialing requirements constituted a breach of the agreement and was cause for termination from Express Scripts's network. Finally, the agreement allowed Express Scripts to unilaterally terminate the contract without cause upon thirty days written notice. Irmat signed the agreement.

Express Scripts required Irmat to submit a recredentialing application in July 2015. Irmat disclosed that 35% of its business came from its retail pharmacy and that 65% of its business came from its mail-order pharmacy. On August 7, 2015, Express

Scripts sent Irmat an e-mail, the subject line of which read "Express Scripts credentials approved," and the text of which stated:

> We are pleased to inform you that your recently submitted credentials have been reviewed and you are approved to continue in the Express Scripts Holding Company pharmacy networks.

Irmat then hired more employees, constructed a multi-million dollar facility in New York, and spent time and money acquiring mail-order accreditations. In May 2016, Express Scripts sent Irmat a letter demanding Irmat cease and desist its mail-order operations because they were in violation of the agreement. Irmat responded with a letter referring to the August 2015 e-mail. On July 15, 2016, Express Scripts replied that Irmat would be terminated from the network in sixty-one days, primarily because of Irmat's mail-order business. Irmat appealed the termination through Express Scripts's internal appeal process. Express Scripts affirmed its decision in a letter dated August 22, 2016, which added that it was also terminating Irmat without cause. Express Scripts terminated Irmat from its network on or about September 30, 2016.

## II.

We review *de novo* the grant of a motion to dismiss. Christiansen v. W. Branch Cmty. Sch. Dist., 674 F.3d 927, 933-34 (8th Cir. 2012). We accept "as true the complaint's factual allegations and grant[ ] all reasonable inferences to the non-moving party." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591 (8th Cir. 2009).

"To survive a 12(b)(6) motion to dismiss, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" McShane Constr. Co. v. Gotham Ins. Co., 867 F.3d 923, 927 (8th Cir. 2017) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "We assess plausibility considering

-4-

only the materials that are 'necessarily embraced by the pleadings and exhibits attached to the complaint.'" Whitney v. Guys, Inc., 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting Mattes v. ABC Plastics, Inc., 323 F.3d 695, 697 n.4 (8th Cir. 2003)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678).

A.

1.

Irmat argues that the agreement is unconscionable because it allowed Express Scripts, but not Irmat, to terminate the agreement without cause. We have held that "[a] bilateral contract is not rendered invalid and unenforceable merely because one party has the right to cancellation while the other does not. There is no necessity 'that for each stipulation in a contract binding the one party there must be a corresponding stipulation binding the other.'" Laclede Gas Co. v. Amoco Oil Co., 522 F.2d 33, 36 (8th Cir. 1975) (quoting James B. Berry's Sons Co. v. Monark Gasoline & Oil Co., 32 F.2d 74, 75 (8th Cir. 1929)). Thus, the inclusion of Express Scripts's unilateral right to terminate the agreement upon thirty days written notice is, by itself, insufficient to support a claim of unconscionability. Id. at 37 (determining that a cancellation clause will invalidate a contract only if its exercise is unrestricted).

Irmat further contends, however, that the agreement is also unconscionable because it was a non-negotiable form contract, *i.e.*, a contract of adhesion. "In Missouri, an adhesion contract, as opposed to a negotiated contract, has been described as a form contract created and imposed by a stronger party upon a weaker party on a 'take this or nothing basis,' the terms of which unexpectedly or

unconscionably limit the obligations of the drafting party."[2] Fuller v. TLC Prop. Mgmt., LLC, 402 S.W.3d 101, 112 (Mo. Ct. App. 2013) (en banc) (internal quotation marks and citations omitted). "Under Missouri law, however, the fact that a contract is one of adhesion does not necessarily make it invalid." Eaton v. CMH Homes, Inc., 461 S.W.3d 426, 438 (Mo. 2015). Missouri has "identified a number of factors indicating unconscionability [including] high pressure sales tactics . . . or unequal bargaining positions." Brewer v. Mo. Title Loans, 364 S.W.3d 486, 489 n.1 (Mo. 2012).

Irmat argues that the contract of adhesion is unconscionable because Express Scripts exerted significant pressure on Irmat to enter into the agreement and had greater bargaining power than Irmat. Specifically, Express Scripts threatened that if Irmat did not complete and return the agreement, Irmat would be in breach of their original network contract and suffer patient disruption. Irmat also cites its allegation that more than 97% of all U.S. retail pharmacies participate in Express Scripts's network and that participating in Express Scripts's network was a matter of business necessity for Irmat.

Irmat argues that this case is analogous to Brewer, in which the Missouri Supreme Court found the contract at issue was unconscionable. In Brewer, the plaintiff, an average consumer, contracted for a secured loan bearing an annual interest rate of 300%. Id. at 487. The agreement required the plaintiff to submit any claims against the defendant to individual arbitration, leaving the defendant free to utilize the courts, id., a provision not present in this case. Furthermore, Irmat is a sophisticated consumer that had operated successfully outside Express Scripts's network prior to 2012. Finally, as the district court properly noted, Irmat had access to more than 100 PBM networks when it joined AccessHealth. See Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp., 748 F.3d 249, 264 (5th Cir. 2014) (noting there

---

[2]The parties agree that Missouri law applies to the state-law claims.

was no contract of adhesion wherein "[t]he Plaintiffs have failed to present any evidence that they were prevented from contracting with another PBM"). Irmat has thus failed to plausibly plead that the agreement was unconscionable.

2.

Irmat next argues that Express Scripts violated its duty of good faith and fair dealing when it terminated Irmat from its network. "Missouri law implies a covenant of good faith and fair dealing in every contract." Farmers' Elec. Coop., Inc. v. Mo. Dep't of Corr., 977 S.W.2d 266, 271 (Mo. 1998). Under Missouri law, generally, "there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." Arbors at Sugar Creek Homeowners Ass'n v. Jefferson Bank & Tr. Co., 464 S.W.3d 177, 185 (Mo. 2015) (internal quotation marks and citations omitted). A party exercising its express contract rights, however, may still breach the covenant if it does so "in a manner that evades the spirit of the agreement and denies the movant the expected benefit of the agreement." Glenn v. HealthLink HMO, Inc., 360 S.W.3d 866, 877 (Mo. Ct. App. 2012).

Irmat does not deny that it violated the contract and that Express Scripts was thus entitled to terminate Irmat from its network for cause. Irmat argues instead that Express Scripts acted in bad faith by terminating Irmat on the basis of its anticompetitive motives when exercising its right to terminate Irmat without cause. Irmat cites BJC Health System v. Columbia Casualty Co., 478 F.3d 908 (8th Cir. 2007), which we conclude is inapposite. We held in that case that under Missouri law a jury could find that a party to a contract acted in bad faith when making a subjective decision regarding the contract that may have been unreasonable and intentionally designed to trigger a termination provision. Id. at 916; see also Martin v. Prier Brass Mfg. Co., 710 S.W.2d 466, 472-73 (Mo. Ct. App. 1986) (determining that defendant

acted in bad faith when it subjectively read contract terms to allow for termination of benefits at will and without notice). Here, however, Express Scripts did not make a discretionary decision in either defining the terms of the agreement or in exercising its rights under the agreement. The Missouri Supreme Court has explicitly held that a defendant does not act in bad faith when it acts in accordance with express contractual rights that allow it to terminate the agreement without cause upon thirty days notice. Bishop & Assocs. v. Ameren Corp., 520 S.W.3d 463, 471-72 (Mo. 2017); see also Amecks, Inc. v. Sw. Bell Tel. Co., 937 S.W.2d 240, 242-43 (Mo. Ct. App. 1996) (concluding that defendant did not act in bad faith when it exercised its contractual right to terminate the contract at any time with at least thirty days notice); Martin v. Am. Family Mut. Ins. Co., 157 F.3d 580, 582 (8th Cir. 1998) (per curiam) ("Because the agency contract unambiguously permitted termination of the agencies at will . . . the covenant of good faith and fair dealing cannot give rise to a right against termination.") (internal citations omitted). Irmat does not dispute that Express Scripts gave the proper notice required by the agreement, and thus it cannot claim bad faith.

3.

Irmat next argues that Express Scripts's August 2015 e-mail constituted a novation of the agreement. It contends that the e-mail excised the prohibition against operating a mail-order pharmacy from the agreement and abrogated Express Scripts's contractual rights to terminate Irmat for and without cause. Irmat argues that Express Scripts thus breached this new contract when it terminated Irmat from the network. Express Scripts responds that because the e-mail was not a novation but merely a contractually obligated step in the recredentialing process, there was no new contract and thus no breach. See D.R. Sherry Constr., Ltd. v. Am. Family Mut. Ins. Co., 316 S.W.3d 899, 904 (Mo. 2010) (concluding that a breach of contract claim requires "a contract between . . . the parties").

Under Missouri law, "[a] novation is a substitution of a new contract obligation for an old one." Health Related Servs., Inc. v. Golden Plains Convalescent Ctr., Inc., 705 S.W.2d 499, 510 (Mo. Ct. App. 1985). The four elements needed for a novation include: "(1) a previous valid obligation; (2) agreement of all parties to a new contract; (3) extinguishment of an old contract; and (4) validity of a new contract." State ex rel. Premier Mktg., Inc. v. Kramer, 2 S.W.3d 118, 122 (Mo. Ct. App. 1999). "In addition to these requirements, there must be evidence that the parties intended to enter into a novation." Id. The new contract must include "[t]he essential elements of an enforceable contract [such as] parties competent to contract, [the existence of] proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation." L.B. v. State Comm. of Psychologists, 912 S.W.2d 611, 617 (Mo. Ct. App. 1995).

Irmat argues that the e-mail's language constitutes evidence of Express Scripts's intent to abrogate the agreement and form a new contract. We conclude that the e-mail was instead part of the recredentialing process required by the agreement. At most, the e-mail and the later cease-and-desist request suggest that Express Scripts delayed its recredentialing process. But any delay did not preclude Express Scripts from denying credentials to Irmat under the agreement's no-waiver provision, which provides:

> No waiver of a breach of any covenant or condition shall be construed to be a waiver of any subsequent breach. No act, delay, or omission done, suffered, or permitted by the parties shall be deemed to exhaust or impair any right, remedy, or power of the parties hereunder.

Moreover, the e-mail lacks the essential elements of a contract and thus cannot be construed as a lawful novation. See Premier Mktg., 2 S.W.3d at 122-23 ("A novation . . . must be sufficiently definite to allow the court to determine its exact meaning and to definitely measure the extent of the promisor's liability."). The e-mail contains no material terms, no expiration date, no mention of the services

Express Scripts would be providing, and no explanation of the rights and obligations of each party. Lacking these essential contractual provisions, there thus was no novation of the agreement.

## B.

Alternatively, Irmat alleges that Express Scripts's e-mail promised that Irmat could continue in the network as a mail-order pharmacy. Irmat then relied on that promise by building a multi-million dollar complex, hiring additional employees, and spending resources to obtain accreditations. Under Missouri law, promissory estoppel requires: "(1) a promise, (2) on which the party seeking to recover relied to his or her detriment, (3) in a way the person making the promise expected or should have expected, and (4) the reliance results in an injustice which can be cured only by enforcement of the promise." Hamra v. Magna Grp., Inc., 956 S.W.2d 934, 939 (Mo. Ct. App. 1997). "In Missouri, promissory estoppel is not a favorite of the law, and each element must clearly appear and be proven by the party seeking its enforcement." Glenn, 360 S.W.3d at 877 (internal quotation marks and citations omitted).

Irmat fails to plausibly plead promissory estoppel. First, Express Scripts's e-mail does not explicitly state that Irmat could operate a mail-order pharmacy and remain in Express Scripts's network, thereby extinguishing the agreement's restriction on mail-order pharmacies. See Prenger v. Baumhoer, 939 S.W.2d 23, 26 (Mo. Ct. App. 1997) (explaining that "[t]he promise giving rise to the cause of action must be definite"). Even if the e-mail were considered to be a promise, Irmat could not have reasonably relied on it because the agreement unambiguously allows termination without cause. We have held that when a contract unambiguously permits termination at will, "promissory estoppel cannot be used to create a right preventing termination." Martin, 157 F.3d at 582 (citing Hamra, 956 S.W.2d at 939); see also Clearly Canadian Beverage Corp. v. Am. Winery, Inc., 257 F.3d 880, 890

(8th Cir. 2001) ("[P]romissory estoppel cannot be used to create rights not included in the contract." (citing Halls Ferry Invs., Inc. v. Smith, 985 S.W.2d 848, 853 (Mo. Ct. App. 1998)). The e-mail, then, could not prevent Express Scripts's termination of Irmat. The district court thus did not err in dismissing Irmat's promissory estoppel claim.

C.

1.

Irmat argues that Express Scripts violated Section 1 of the Sherman Act by conspiring with other PBM-owned, mail-order pharmacies to boycott independent mail-order pharmacies. "Liability under § 1 of the Sherman Act, 15 U.S.C. § 1, requires a 'contract, combination . . . , or conspiracy, in restraint of trade or commerce.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 548 (2007). "'[T]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" Id. at 553 (second alteration in original) (quoting Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540 (1954)). To survive a Rule 12(b)(6) motion to dismiss, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." Id. at 556. "However, [a]n allegation of parallel conduct . . . gets the complaint close to stating a claim," and "[w]ith 'further factual enhancement,' plaintiffs can 'nudge[ ] their claims across the line from conceivable to plausible.'" In re Pre-Filled Propane Tank Antitrust Litig., 860 F.3d 1059, 1069 (8th Cir. 2017) (alterations in original) (quoting Twombly, 550 U.S. at 557, 570).

Irmat fails to plausibly plead parallel conduct. It claims that CVS and Express Scripts conspired to terminate Irmat from their PBM networks because it operated a mail-order pharmacy that competed with Express Scripts's and CVS's mail-order pharmacies. Irmat had been a member of CVS's pharmacy networks since 2012. In August 2016, CVS required Irmat to participate in its mail-order network, three

-11-

months after Express Scripts sent Irmat a letter demanding that Irmat abandon its mail-order pharmacy operations. Although CVS later terminated Irmat from its pharmacy networks on February 3, 2017, the fact that CVS allowed Irmat to join in its mail-order network at all suggests that CVS and Express Scripts did not conspire to boycott Irmat. Irmat contends, however, that the August 2016 requirement to participate in CVS's mail-order pharmacy network was a veiled plan to reimburse Irmat at lower rates than it had paid in the past. Irmat also claims that CVS subjected Irmat to abusive audits throughout the years. Even assuming the truth of those allegations, there is no evidence that Express Scripts joined in CVS's conduct. Express Scripts never required Irmat to enter into a mail-order network so that it could reimburse prescriptions at lower rates, nor does Irmat contend that Express Scripts ever subjected Irmat to abusive audits.

The only allegation that hints at parallel conduct is that both CVS and Express Scripts terminated Irmat from their networks. But the terminations lack temporal proximity. Express Scripts notified Irmat of termination in July 2016, six months before CVS notified Irmat of termination. In determining whether six months was too long of a time frame to suggest parallel activity, the district court looked to In re Graphics Processing Units Antitrust Litigation, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007), in which the court found that three months between actions fell "short of unusual, lockstep . . . behavior." We do not hold that actions taken within six months of each other can never constitute parallel conduct, but only that the terminations here, executed under dissimilar circumstances and separated by six months, did not constitute parallel conduct. See Burtch v. Milberg Factors, Inc., 662 F.3d 212, 228-29 (3d Cir. 2011) (dismissing group boycott claim partly because the conduct of the defendants was not similar). Because Irmat fails to plausibly plead parallel conduct, no discussion of any "plus factors" is necessary. The district court correctly dismissed Irmat's Section 1 claim.

2.

Irmat alleges that Express Scripts violated Section 2 of the Sherman Act because it leveraged its power as a PBM to exclude mail-order pharmacies from its PBM network. This led to Express Scripts's having a monopoly power in the submarket for mail-order services to Express Scripts members. Section 2 makes it unlawful to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. To state a monopoly claim, Irmat must plead a plausible relevant market and that Express Scripts engaged in anticompetitive conduct. Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004).

Irmat first fails to plead a relevant market. "It is the plaintiff's burden to define the relevant market." Double D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 560 (8th Cir. 1998). "The definition of the relevant market has two components—a product market and a geographic market."[3] Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 345 (8th Cir. 1995). "The relevant product market includes all reasonably interchangeable products." Double D Spotting Serv., 136 F.3d at 560 (citing Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997)). In exceptional circumstances, a relevant market can be defined by the defendant's own product or service. See Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 482 (1992).

Irmat claims that the relevant market is the market for mail-order pharmacy services to Express Scripts members–a submarket made up of only Express Scripts's services within the broader market of all mail-order pharmacy services. See Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). We conclude that Irmat's market is too narrowly defined. Express Scripts is not the only mail-order pharmacy

_____

[3]The parties agree that the relevant geographic market is the United States.

available to consumers. Irmat thus fails to include all interchangeable mail-order pharmacy services in its relevant market. See Little Rock Cardiology Clinic PA v. Baptist Health, 591 F.3d 591, 597-98 (8th Cir. 2009) (concluding plaintiff's proposed relevant market was too narrow because it omitted potential customers). Further, absent contractual restrictions, the customers of Irmat's proposed market–health insurance plans–are free to choose other PBMs or independent pharmacies that offer mail-order pharmacy services. See Queen City Pizza, 124 F.3d at 438 (refusing to adopt the position that "contractual restraints render otherwise identical products non-interchangeable for purposes of relevant market definition"). The district court thus correctly concluded that Irmat had failed to plead a relevant market. See Little Rock Cardiology Clinic, 591 F.3d at 601 (8th Cir. 2009) (affirming the district court's dismissal of plaintiff's Section 2 claim because plaintiff failed to show a proper relevant market).

Irmat also fails to allege that Express Scripts engaged in anticompetitive conduct. "[T]he possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." Trinko, 540 U.S. at 407. Generally, Section 2 of the Sherman Act does not restrict the right "of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." Id. at 408 (alterations in original) (internal quotation marks and citations omitted). The Supreme Court has recognized a "limited exception" to the right to refuse to deal with other firms. Id. at 409 (citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 601 (1985)). In Aspen, the Court affirmed a jury verdict for a plaintiff ski company that alleged that a competitor ski business had violated Section 2 of the Sherman Act. Aspen, 472 U.S. at 595, 611. The defendant had begun to sell a discounted lift ticket to the three ski areas it owned, after years of cooperating with plaintiff in selling joint tickets to both the defendant's and plaintiff's ski areas. Id. at 591-93. The "limited exception" set forth in Aspen is not applicable here. Irmat and Express Scripts did not have a voluntary, years-long relationship regarding their competing mail-order

-14-

pharmacies. Irmat has failed to plausibly allege anticompetitive conduct on Express Scripts's part, and the district court thus correctly dismissed Irmat's Section 2 claim.

3.

Irmat alleges that Express Scripts violated Section 1 of the Sherman Act by engaging in a tying arrangement when it "exercised its market power to force its retail pharmacy network members to refrain from dispensing drugs via mail-order delivery." A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." Eastman Kodak, 504 U.S. at 461-62 (quoting N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6 (1958)).

For a plausible tying claim in this situation, Irmat must have alleged that Express Scripts conditioned participation in its PBM network on either the purchase of a tied product or service, or on refraining from the purchase of a tied product or service. Irmat instead alleges that Express Scripts conditioned participation in its PBM network on the requirement that Irmat refrain from operating a competing business. This, in turn, is a repackaged attempt at Irmat's monopoly claim and fails for the reasons stated above. The district court thus did not err in dismissing Irmat's tying claim.

D.

Finally, Irmat alleges that Express Scripts violated the Any Willing Provider laws of Georgia, Mississippi, and North Carolina when it denied Irmat the

opportunity to mail prescriptions to Express Scripts members in each of these states.[4] Irmat has pointed to no case law that suggests that these laws apply to PBMs, and we decline to extend the reach of these laws to PBMs as a matter of first impression. See Ashley Cty., Ark. v. Pfizer, Inc., 552 F.3d 659, 673 (8th Cir. 2009) (concluding that "is not the role of a federal court to expand state law in ways not foreshadowed by state precedent") (internal quotation marks and citations omitted).

## III.

Irmat argues that the district court should have granted Irmat leave to amend its complaint to replead more specific facts. But Irmat never moved to amend its complaint, nor did it request such relief in its memorandum in opposition to Express Scripts's motion to dismiss. See United States v. Mask of Ka-Nefer-Nefer, 752 F.3d 737, 742 (8th Cir. 2014) ("[A] district court in granting a motion to dismiss is not obliged to invite a motion for leave to amend if plaintiff did not file one."). Further, Irmat did not include a proposed amendment in its brief. See Wolgin v. Simon, 722 F.2d 389, 395 (8th Cir. 1983) ("[T]o preserve the right to amend a complaint a party must submit a proposed amendment along with its motion.").

The district court's order of dismissal is affirmed.

———————————————

———————————————

[4]Ga. Code Ann. § 26-4-144;  Miss. Code. Ann. § 83-9-6; and  N.C. Gen. Stat. § 58-51-37.