# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1378

_____

Arkansas Times LP

*Plaintiff - Appellant*

v.

Mark Waldrip, in his official capacity as Trustee of the University of Arkansas Board of Trustees; John Goodson, in his official capacity as Trustee of the University of Arkansas Board of Trustees; Kelly Eichler, in her official capacity as Trustee of the University of Arkansas Board of Trustees; David Pryor, in his official capacity as Trustee of the University of Arkansas Board of Trustees; Stephen Broughton, in his official capacity as Trustee of the University of Arkansas Board of Trustees; C C Gibson, in his official capacity as Trustee of the University of Arkansas Board of Trustees; Tommy Boyer, in his official capacity as Trustee of the University of Arkansas Board of Trustees; Steve Cox, in his official capacity as Trustee of the University of Arkansas Board of Trustees

*Defendants - Appellees*

------------------------------

First Amendment Scholars; Council on American Islamic Relations; American Friends Service Committee; Israel Palestine Mission Network of the Presbyterian Church; A Jewish Voice for Peace Inc.; U.S. Campaign for Palestinian Rights; U.S. Palestinian Community Network; U.S. Campaign for the Academic and Cultural Boycott of Israel; Friends of Sabeel North America; Institute for Free Speech; Foundation for Individual Rights in Education; Palestine Legal; The Center for Constitutional Rights; Bahia Amawi; National Lawyers Guild; Project South; J Street; T'ruah: The Rabbinic Call for Human Rights; 15 Media Organizations; Reporters Committee for Freedom of the Press; Lawrence Glickman

*Amici on Behalf of Appellant(s)*

Michael C. Dorf; Eugene Volokh; Zachor Legal Institute; Andrew Koppelman; Shurat Hadin-Israel Law Center; American Jewish Committee; Christians United for Israel; Israeli-American Coalition for Action; The Israel Project; Agudath Israel of America; The Union of Orthodox Jewish Congregations of America; Standwithus; State of Arizona; State of Florida; State of Georgia; State of Indiana; State of Missouri; State of Ohio; State of Texas; State of Utah; State of West Virginia; The Louis D. Brandeis Center Inc.; The American Center of Law and Justice; State of Idaho; State of Kansas; State of Kentucky; State of Montana; State of Oklahoma; State of South Carolina; State of South Dakota; Eleven Constitutional and Business Law Professors

*Amici on Behalf of Appellee(s)*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock
_____

Submitted: September 21, 2021
Filed: June 22, 2022
_____

Before SMITH, Chief Judge, LOKEN, GRUENDER, BENTON, SHEPHERD, KELLY, ERICKSON, GRASZ, STRAS, and KOBES, Circuit Judges, En Banc.
_____

KOBES, Circuit Judge.

In 2017, Arkansas passed a law requiring public contracts to include a certification that the contractor will not "boycott" Israel. Arkansas Times sued, arguing that the law violates the First Amendment. The district court[1] dismissed the action. Sitting en banc, we conclude that the certification requirement does not violate the First Amendment and affirm.

_____

[1] The Honorable Brian S. Miller, United States District Judge for the Eastern District of Arkansas.

-2-

## I.

Arkansas Act 710 prohibits state entities from contracting with private companies unless the contract includes a certification that the company "is not currently engaged in, and agrees for the duration of the contract not to engage in, a boycott of Israel." Ark. Code Ann. § 25-1-503(a)(1). The statute defines "boycott of Israel" as "engaging in refusals to deal, terminating business activities, or other actions that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories, in a discriminatory manner." Ark. Code Ann. § 25-1-502(1)(A)(i). The Act exempts contracts if a company provides goods or services for at least 20% less than the lowest certifying business, or if the contract has a total potential value of less than $1,000. Ark. Code. Ann. § 25-1-503(b).

Arkansas Times, a newspaper, contracts with University of Arkansas-Pulaski Technical College. It sued for a preliminary injunction, arguing that the certification violates the First Amendment in two ways: (1) by placing an unconstitutional condition on the award of government contracts; and (2) by compelling speech. The district court dismissed the suit, holding that economic boycotts do not implicate the First Amendment because they are neither speech nor expressive conduct.

A divided panel of this court reversed, holding that the certification requirement was unconstitutional. The panel interpreted the language prohibiting "other actions intended to limit commercial relations with Israel" to include protected speech. We granted rehearing en banc.

## II.

We review the grant of a motion to dismiss *de novo* and accept the complaint's factual allegations as true, granting all reasonable inferences to the non-moving party. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512

(8th Cir. 2018).  We review the denial of a preliminary injunction for abuse of discretion.  *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019).

## A.

The First Amendment prohibits the government from "abridging the freedom of speech."  U.S. Const. amend. I; *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940) ("The freedom of speech . . . [is] secured to all persons by the Fourteenth Amendment against abridgment by a state.").  This includes nonverbal conduct that is intended to be, and likely to be understood as, expressing a particularized message.  *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

These constitutional protections don't just prevent outright prohibitions on speech; they also prohibit the government from imposing unconstitutional conditions that chill or deter speech.  *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972).  The government imposes an unconstitutional condition when it requires someone to give up a constitutional right in exchange for a government benefit.  *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994).  This includes making government benefits contingent on endorsing a particular message or agreeing not to engage in protected speech.  *See Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012) ("The government may not . . . compel the endorsement of ideas that it approves."); *Speiser v. Randall*, 357 U.S. 513, 518 (1958) ("To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech.").

The basic dispute in this case is whether "boycotting Israel" only covers unexpressive commercial conduct, or whether it also prohibits protected expressive conduct.  Arkansas Times points us to *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), which held that expressive conduct accompanying a boycott is protected by the First Amendment.  The State, on the other hand, argues that

-4-

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc. (FAIR)*, 547 U.S. 47 (2006) controls. There, the Supreme Court held that First Amendment protection does not extend to non-expressive conduct intended to convey a political message.

*Claiborne* involved a boycott of white business owners organized by the N.A.A.C.P. 458 U.S. at 889. The participants refused to purchase anything from white-owned businesses and encouraged support for the boycott with speeches, marches, and picketing. *Id.* at 902–03. But some participants took it further, committing acts of violence against those who opposed the boycott. *Id.* at 903–06. White business owners sued to recover physical and economic losses caused by the boycott and enjoin future boycotts. *Id.* at 889. So the question before the Court was whether the activities in support of the boycott, both peaceful and violent, were protected. *Id.* at 907. The Court first noted that the boycott "took many forms," including speeches, picketing, marches, and pamphleteering. *Id.* at 907, 909–11. It then held that the boycott "clearly involved constitutionally protected activity" and that "[e]ach of these elements of the boycott is a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendments." *Id.* at 911, 907. The Court held that the violence and threats that accompanied the boycott were "beyond the pale of constitutional protection." *Id.* at 933. So *Claiborne* instructs us to examine the *elements* of a boycott to determine which activities are constitutionally protected.

*FAIR*, on the other hand, dealt with a different issue—whether the First Amendment protects non-expressive conduct. 547 U.S. at 65–66. In *FAIR*, several law schools banned military recruiters on campus in protest of the military's "don't ask, don't tell" policy. *Id.* at 51. Congress then passed the Solomon Amendment, which conditioned some federal funding on allowing military recruiters on campus. *Id.* at 52. The law schools sued, arguing that this limited their speech by prohibiting expressive conduct—i.e., banning military recruitment on campus. *Id.* at 54. The Court disagreed, holding that the law schools' refusal to allow military recruiters did not implicate the First Amendment because such a refusal was "not inherently

expressive." *Id.* at 66. The Court made clear that the question wasn't whether someone *intended* to express an idea, but whether a neutral observer would *understand* that they're expressing an idea. *Id.* In that case, an observer would have no way of knowing the law school was expressing disapproval of the military without accompanying explanatory speech. *Id.* An observer could assume that the law school's interview rooms were full, or that the recruiters preferred to interview off-campus. *Id.* But the Court made clear that only the schools' *non-expressive* conduct was unprotected. *Id.* at 60. The law schools were still free to express their disapproval of "don't ask, don't tell" in other ways, such as posting signs and organizing student protests. *Id.*

Arkansas Times argues that Act 710 runs afoul of *Claiborne*, which it suggests held that boycotts are protected under the First Amendment. But the Court stopped short of declaring that a "boycott" itself—that is, the refusal to purchase from a business—is protected by the First Amendment. Instead, it acknowledged that "States have broad power to regulate economic activity," but held that this power does not allow for a prohibition on "peaceful political activity such as that found *in the boycott* in this case." 458 U.S. at 913 (emphasis added). Contrary to Arkansas Times's argument, *Claiborne* only discussed protecting expressive activities *accompanying* a boycott, rather than the purchasing decisions at the heart of a boycott.

So this case turns on what Act 710 bans: protected boycott-related activity, or non-expressive commercial decisions? To answer that, we look to the text of the statute.

B.

We review questions of statutory interpretation *de novo*. *Robinett v. Shelby Cnty. Healthcare Corp.*, 895 F.3d 582, 588 (8th Cir. 2018). When interpreting a state statute that has not been addressed by that state's highest court, "it is our

responsibility to predict, as best we can, how that court would decide the issue." *Brandenburg v. Allstate Ins. Co.*, 23 F.3d 1438, 1440 (8th Cir. 1994). In doing so, we apply the state's rules of statutory construction. *See In re Dittmaier*, 806 F.3d 987, 989 (8th Cir. 2015).

Act 710 prohibits public entities from contracting with companies unless they certify that they won't boycott Israel. Ark. Code Ann. § 25-1-503(a)(1). It defines "boycott of Israel" as (1) "engaging in refusals to deal"; (2) "terminating business activities"; or (3) taking "other actions that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories," "in a discriminatory manner." Ark. Code. Ann. § 25-1-502(1)(A)(I).

The third category is in dispute. Arkansas Times argues that the catch-all "other actions" language includes constitutionally protected activity that is intended to limit commercial relations with Israel. This interpretation implicates protected speech, such as picketing outside a business that has commercial relations with Israel. The State, on the other hand, argues that the statute only prohibits non-expressive commercial decisions, which are not protected under the First Amendment. Arkansas's standard rules of statutory interpretation support the State's reading.

Arkansas law directs us to examine the Act in its entirety and interpret it according to legislative intent. *See Ark. Tobacco Control Bd. v. Santa Fe Nat. Tobacco Co.*, 199 S.W.3d 656, 659 (Ark. 2004) ("The basic rule of statutory construction to which all interpretive guides must yield is to give effect to the intent of the Legislature."). In doing so, we must look at the language, legislative history, and subject matter involved. *Id.*

When considering the constitutionality of a statute, Arkansas's "first and most important rule of statutory interpretation is that a statute is presumed constitutional and all doubts are resolved in favor of constitutionality." *Booker v. State*, 984

S.W.2d 16, 21 (Ark. 1998). The party challenging a statute has the burden of showing that the statute infringes on a constitutional right. *Id.* Because Arkansas Times's interpretation would make the statute unconstitutional, this canon weighs heavily in favor of the State's interpretation.

Other tools of statutory interpretation also support the State's reading. Under *ejusdem generis*, "when general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Edwards v. Campbell*, 370 S.W.3d 250, 253 (Ark. 2010) (citation omitted). For example, a statute authorizing a school "to employ and pay teachers, janitors, and other employes of the schools" would authorize the school board to hire a principal, but not a lawyer. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 201 (2012) (cleaned up). This principle applies here. The more specific phrases before the "other actions" provision—"engaging in refusals to deal" and "terminating business activities"—relate solely to commercial activities. It follows that the more general phrase, "other actions," does too.

To the extent that there's any remaining ambiguity, the Act's legislative intent resolves it in favor of the State's interpretation. The legislature's motive for passing Act 710 was primarily economic. It repeatedly expressed concern for the commercial viability of companies that refuse to do business with Israel and the effect this could have on the state's finances. *See* Ark. Code Ann. § 25-1-501. For example, § 25-1-501(3) points out that companies that "make discriminatory decisions on the basis of national origin . . . impair [their] commercial soundness." And § 25-1-501(5) says these companies are "unduly risky contracting partner[s] or vehicle[s] for investment" because they don't have access to Israeli innovations.[2]

---

[2]We acknowledge that one of the Act's six legislative findings suggests a broader purpose. Ark. Code. Ann. § 25-1-501(6) states that Arkansas seeks to "implement the United States Congress's announced policy of . . . support[ing] the divestment of state assets from companies that support or promote actions to boycott,

-8-

These findings suggest a purely commercial purpose for the statute and weigh strongly in favor of upholding the statute.

Under Arkansas's canons of statutory interpretation, we think the Arkansas Supreme Court would read Act 710 as prohibiting purely commercial, non-expressive conduct. It does not ban Arkansas Times from publicly criticizing Israel, or even protesting the statute itself. It only prohibits economic decisions that discriminate against Israel. Because those commercial decisions are invisible to observers unless explained, they are not inherently expressive and do not implicate the First Amendment.

III.

Arkansas Times also argues that the statute unconstitutionally compels speech by requiring it to include a certification that the company will not "boycott" Israel for the duration of the contract. The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The compelled speech doctrine prohibits the government from making someone disseminate a political or ideological message. *See id.* at 713 (holding that a state cannot require a citizen to display the state motto, "Live Free or Die," on their license plate); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (holding unconstitutional a law requiring students to salute the flag every day).

---

divest from, or sanction Israel." (quoting H.R. 825, 114th Cong. (2015)). But this language is borrowed from Congress. And even if it supports Arkansas Times's interpretation, it is outweighed by the other findings, which evidence a purely economic purpose. *See* § 25-1-501(1), (3)–(5). On balance, the legislative findings, read in light of the statute, evidence a legislative intent to regulate *commercial* conduct, not political speech.

"Compelled statements of fact . . . like compelled statements of opinion, are subject to First Amendment scrutiny." *FAIR*, 547 U.S. at 62. But the certification requirement here is markedly different from other compelled speech cases. Although it requires contractors to agree to a contract provision they would otherwise not include, it does not require them to publicly endorse or disseminate a message. Instead, the certification targets the noncommunicative aspect of the contractors' conduct—unexpressive commercial choices. The "speech" aspect— signing the certification—is incidental to the regulation of conduct. *See id.* at 62 ("There is nothing in this case approaching a Government-mandated pledge or motto that the school must endorse. The compelled speech to which the law schools point is plainly incidental to the Solomon Amendment's regulation of conduct.").

We are not aware of any cases where a court has held that a certification requirement concerning unprotected, nondiscriminatory conduct is unconstitutionally compelled speech. A factual disclosure of this kind, aimed at verifying compliance with unexpressive conduct-based regulations, is not the kind of compelled speech prohibited by the First Amendment.

## IV.

The judgment of the district court is affirmed.

KELLY, Circuit Judge, dissenting.

At issue in this case is the meaning of the third prong of the statutory definition of "boycott of Israel"[3]: "other actions that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories," "in a discriminatory manner." Ark. Code Ann. § 25-1-502(1)(A)(i). As the court tacitly acknowledges, this provision of the statute is ambiguous. See

---

[3] "Boycott Israel" has the same definition under the Act as "boycott of Israel."

Simpson v. Cavalry SPV I, LLC, 440 S.W.3d 335, 338 (Ark. 2014) ("A statute is considered ambiguous if it is open to more than one construction."). The State argues that the phrase "other actions" is limited to commercial conduct, which it describes as non-expressive and not protected by the First Amendment. But the State's narrow reading of the definition of "boycott of Israel" is not the only reasonable interpretation. Actions "intended to limit commercial relations with Israel" could encompass a much broader array of conduct than only commercial conduct, at least some of which would be protected by the First Amendment. One could imagine a company posting anti-Israel signs, donating to causes that promote a boycott of Israel, encouraging others to boycott Israel, or even publicly criticizing the Act with the intent to "limit commercial relations with Israel" as a general matter. And any of that conduct would arguably fall within the prohibition.

To resolve this ambiguity, we should interpret the statute according to legislative intent by looking at the Act in its entirety. Under Arkansas law, "[t]he basic rule of statutory construction to which all other interpretive guides must yield is to give effect to the intent of the legislature." Thomas v. State, 864 S.W.2d 835, 836 (Ark. 1993). "Where the language of a statute is plain and unambiguous, [the] court determines legislative intent from the ordinary meaning of the language used." Simpson, 440 S.W.3d at 337. "When a statute is ambiguous, [we] must interpret it according to legislative intent and our review becomes an examination of the whole act." Id. at 338. We "review[] the act in its entirety" and "reconcile provisions to make them consistent, harmonious, and sensible in an effort to give effect to every part." Id. And our task includes consideration of "the legislative history, the language, and the subject matter involved." Id.

The court acknowledges that we should construe the Act in light of legislative intent. Yet it begins not with an analysis of the text but with a presumption of constitutionality, a canon it says "weighs heavily" in the State's favor. The Supreme Court of Arkansas "will construe a statute with a limiting interpretation to preserve the constitutionality of the statute." Ark. Hearing Instrument Dispenser Bd. v.

<u>Vance</u>, 197 S.W.3d 495, 499 (Ark. 2004). However, it will only do so "provided that such a construction does not contravene the intent of the legislature." <u>Id.</u>; <u>see also</u> <u>Booker v. State</u>, 984 S.W.2d 16, 21 (Ark. 1998) ("[I]t must be remembered that all other interpretative guides must give effect to the intent of the legislature." (citing <u>Thomas</u>, 864 S.W.2d at 836)). In my view, it is incorrect under Arkansas principles of statutory interpretation to apply this canon *before* conducting a close reading of the Act as a whole to determine the legislative intent.

An examination of the Act as a whole reveals that the legislature intended to prohibit commercial and expressive behavior. Section 502(1)(B) permits the State to consider specified "type[s] of evidence" to determine whether "a company is participating in a boycott of Israel." This evidence includes the company's own "statement that it is participating in boycotts of Israel." And evidence that a government contractor "has taken the boycott action"[4] "at the request, in compliance with, or in furtherance of calls for a boycott of Israel"—that is, in association with others—can be considered to enforce the Act. Thus, at a minimum, the State can consider a company's speech and association with others to determine whether that company is participating in a "boycott of Israel." And the State may refuse to enter into a contract with the company on that basis, thereby limiting what a company may say or do in support of such a boycott.[5] In this way, the Act implicates the First Amendment rights of speech, assembly, association, and petition recognized to be constitutionally protected boycott activity. <u>See</u> <u>N.A.A.C.P. v. Claiborne Hardware Co.</u>, 458 U.S. 886, 911–12 (1982); <u>Jordahl v. Brnovich</u>, 336 F. Supp. 3d 1016, 1041–43 (D. Ariz. 2018), <u>vacated as moot</u>, 789 F. App'x 589 (9th Cir. 2020); <u>Koontz v. Watson</u>, 283 F. Supp. 3d 1007, 1021–22 (D. Kan. 2018).

---

[4]The Act does not define "boycott action."

[5]In contrast, "[t]he Solomon Amendment neither limits what law schools may say nor requires them to say anything." <u>Rumsfeld v. F. for Acad. & Institutional Rts., Inc.</u>, 547 U.S. 47, 60 (2006).

That the term "other actions" captures constitutionally protected activity is further supported by the Act's codified legislative findings. Such findings establish the intent of the legislature for purposes of interpreting state statutes. See, e.g., McDaniel v. Spencer, 457 S.W.3d 641, 650 (Ark. 2015) (treating the "legislative-findings portion of the [a]ct" as indicative of the issue that the "General Assembly was concerned" about when it enacted the statute); Gallas v. Alexander, 263 S.W.3d 494, 509 (Ark. 2007) (holding that a "review of the [a]ct reveals that the General Assembly clearly and specifically set forth its findings and purpose for the [a]ct" in a section titled "Legislative findings," and relying on those findings to determine the legislature's "clear intent"); Manning v. State, 956 S.W.2d 184, 186 (Ark. 1997) ("The General Assembly declares its intent and purposes of the [a]ct in [a section] entitled, 'General legislative findings, declarations, and intent.'"); Ark. Charcoal Co. v. Ark. Pub. Serv. Comm'n, 773 S.W.2d 427, 429 (Ark. 1989) (relying on the "broad policy objectives articulated by the General Assembly in its legislative findings" to determine the purposes of the statute). In this Act, it is true some of the legislative findings codified at § 25-1-501 mention only economic concerns. But the sixth codified legislative finding specifically states that Arkansas seeks to implement the policy of "examining a company's *promotion* or compliance with unsanctioned boycotts, divestment from, or sanctions against Israel as part of its consideration in awarding grants and contracts." Ark. Code Ann. § 25-1-501(6) (emphasis added). It further states that Arkansas "supports the divestment of state assets from companies that *support or promote* actions to boycott, divest from, or sanction Israel." Id. (emphasis added). The court's decision to "balance" the legislative findings and determine that the sixth is "outweighed by the other findings" reads out one of the legislature's explicit purposes in enacting the statute. By the express terms of the Act, Arkansas seeks not only to avoid contracting with companies that refuse to do business with Israel. It also seeks to avoid contracting with anyone who supports or promotes such activity.[6]

---

[6]I also note that the Act uses the singular word "boycott" throughout the legislative findings. While "boycott of Israel" and "boycott Israel" are defined in the Act, the word "boycott" is not. Compare Ark. Code Ann. § 25-1-501(1)

-13-

Nor does the plain language of the certification at issue in this case limit its reach to commercial conduct. The legislature did not include a form certification, so the State drafted its own version for Arkansas Times to sign, agreeing and certifying that, as a contractor, it will not engage in a "boycott of Israel" for the duration of its contract. See Appendix A. But the certification does not define or even cite to the statutory definition of "boycott of Israel." Rather, a contractor is left to determine on its own what activity is or is not prohibited. And relying on the ordinary meaning of "boycott," see supra note 4, a contractor could readily conclude that it was prohibited from both refusing to engage commercially with Israel *and* supporting or promoting a boycott of Israel or Israeli goods. At a minimum, it seems highly unlikely that a lay-contractor unfamiliar with this lawsuit would give the phrase "boycott of Israel" the same limited definition the State now urges and the court accepts. Instead, any contractor who does not want to risk violating the terms

---

("[b]oycotts and related tactics"), id. § 25-1-501(2) ("boycott activity"), and id. § 25-1-501(6) ("unsanctioned boycotts"), with id. § 25-1-502(1)(a)(i) (defining "boycott Israel" and "boycott of Israel"). Under Arkansas law, "[i]n the absence of a statutory definition for a term, we resort to the plain meaning of a term." State v. Jernigan, 385 S.W.3d 776, 781 (Ark. 2011). According to dictionaries from the time the Act was enacted, the plain meaning of "boycott" includes an inherent element of expression. See, e.g., *Boycott*, Oxford English Dictionary (3d ed. 2008) ("To withdraw from commercial or social interaction with (a group, nation, person, etc.) as a protest or punishment; to refuse to handle or buy (goods), or refuse to participate in (an event, meeting, etc.), as a protest."); *Boycott*, Merriam-Webster Dictionary (11th ed. 2003) ("to engage in a concerted refusal to have dealings with (a person, a store, an organization, etc.) usually to express disapproval or to force acceptance of certain conditions"); *Boycott*, Cambridge Advanced Learner's Dictionary (4th ed. 2013) ("to refuse to buy a product or take part in an activity as a way of expressing strong disapproval"); *Boycott*, American Heritage Dictionary (5th ed. 2011) ("To abstain from or act together in abstaining from using, buying, dealing with, or participating in as an expression of protest or disfavor or as a means of coercion."). These definitions guide my reading of the legislative findings and suggest that the Act's intent was to restrict both economic refusals to deal *and* a government contractor's ability to support or promote boycotts of Israel through its speech.

-14-

of its contract might very well refrain even from activity that is constitutionally protected.

Considering the Act as a whole—as Arkansas principles of statutory interpretation instruct—it is my view that the term "other actions" in the definition of "boycott Israel" and "boycott of Israel" encompasses more than "purely commercial, non-expressive conduct." The court's reliance on the interpretative canon of *ejusdem generis* does not convince me otherwise. Under Arkansas law, this tool of statutory construction applies only where "there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires." McKinney v. Robbins, 892 S.W.2d 502, 503 (Ark. 1995). Arkansas law counsels that canons of construction like *ejusdem generis* "are only aids to judicial interpretation, and they will not be applied . . . *to defeat legislative intent and purpose*." Seiz Co. v. Ark. State Highway & Transp. Dep't, 324 S.W.3d 336, 342 (Ark. 2009) (emphasis in original). In my view, the Act as a whole reflects the legislature's intent to include more than purely commercial conduct in its definition of "boycott of Israel," and the canon of *ejusdem generis* cannot be used to defeat that intent.

The Act requires government contractors, as a condition of contracting with Arkansas, to agree not to engage in economic refusals to deal with Israel or to support or promote boycotts of Israel. Because the Act restricts government contractors' ability to participate in speech and other protected, boycott-associated activities recognized by the Supreme Court in Claiborne, see 458 U.S. at 915, it imposes a condition on government contractors that implicates their First Amendment rights.

Of course, determining that the Act's condition for contracting with Arkansas implicates the First Amendment would not end the analysis because not all such conditions are unconstitutional. See, e.g., Rust v. Sullivan, 500 U.S. 173, 198 (1991). A funding condition unconstitutionally burdens First Amendment rights

where it "seek[s] to leverage funding to regulate speech outside the contours of the program itself." Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc. (AOSI), 570 U.S. 205, 214–15 (2013); see also FCC v. League of Women Voters of Cal., 468 U.S. 364, 399–401 (1984). Supporting or promoting boycotts of Israel is constitutionally protected under Claiborne, yet the Act requires government contractors to abstain from such constitutionally protected activity. Without any explanation of how this condition seeks to "define the limits of [the State's] spending program," it can be viewed only as seeking to "leverage funding to regulate speech outside the contours of the program itself." AOSI, 570 U.S. at 214–15. Thus, I would conclude that the Act prohibits the contractor from engaging in boycott activity outside the scope of the contractual relationship "on its own time and dime." Id. at 218. Such a restriction violates the First Amendment.[7]

       I respectfully dissent.

_____

---

[7] Because I would find that the Act violates the First Amendment, I would not reach the question of whether the certification in this case constitutes compelled speech. I disagree with the court that the Act covers only unexpressive commercial choices, so I disagree that the certification requires only a "factual disclosure" intended to "verify[] compliance with unexpressive conduct-based regulations."

# APPENDIX A

## RESTRICTION OF BOYCOTT OF ISRAEL CERTIFICATION

Pursuant to Arkansas Code Annotated §25-1-503, a public entity **shall not** enter into a contract valued at $1,000 or greater with a company unless the contract includes a written certification that the person or company is not currently engaged in, and agrees for the duration of the contract not to engage in, a boycott of Israel.

By signing below, the Contractor agrees and certifies that they do not currently boycott Israel, and will not boycott Israel during any time in which they are entering into, or while in contract, with the University of Arkansas - Pulaski Technical College. If at any time after signing this certification the contractor decides to engage in a boycott of Israel, they must notify the University of Arkansas – Pulaski Technical College in writing.

If the Contractor currently boycotts Israel, or engages in the boycott of Israel while in contract with the University of Arkansas – Pulaski Technical College, see Arkansas Code Annotated §25-1-503.

| | |
|---|---|
| Description of product or service | |
| Contractor name | |

Contractor Signature: _____     Date: _____
Signature must be hand written, in ink



A 21

Appellate Case: 19-1378     Page: 23     Date Filed: 04/09/2019 Entry ID: 4775509