Filed 3/15/23  Platt v. OptumRX CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PLATT, LLC et al.,<br><br>        Plaintiffs and Respondents,<br>v.<br>OPTUMRX, INC.,<br><br>        Defendant and Appellant. | A163061<br><br>(Alameda County<br>Super. Ct. No. RG20074100) |

Appellant OptumRx, Inc. enables pharmacies to fulfill prescriptions of customers whose health-insurance plans contract with OptumRx. Reimbursements to the pharmacies are made under the terms of a manual that is available to the pharmacies online.  When respondent pharmacies sued OptumRx, the company filed a motion to compel arbitration in accordance with arbitration provisions in the online manual.  The trial court denied the motion after finding that the arbitration provisions are unconscionable.  We agree with this finding.  The provisions are unconscionable because they are set forth in a document that, although posted online, is not signed or agreed to by the pharmacies, and that establishes procedures that favor OptumRx over the pharmacies.  These procedures allow OptumRx to unilaterally change arbitration terms, deny the pharmacies remedies that are available to OptumRx, impose high arbitration costs on the pharmacies, and severely limit the pharmacies' ability to engage

1

in discovery.  Because we agree that the provisions are unconscionable and that the trial court did not abuse its discretion when it declined to sever the unconscionable terms, we affirm.

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

Respondents are 22 independently owned California pharmacies that fill prescriptions for customers who have health insurance.  Each receive services from OptumRx, a pharmacy-care services company, generally referred to as a pharmacy benefit manager or "PBM."  As a PBM, OptumRx contracts with health-insurance plans to manage their prescription-drug benefit programs, then separately contracts with pharmacies to dispense the prescription drugs to people enrolled in the benefit plans.[1]

Sometimes OptumRx contracts directly with pharmacies.  Other times, it contracts with pharmacy service administrative organizations, which in

---

[1] A PBM is defined by statute as an entity that, either directly or through an intermediary, manages prescription-drug coverage "including, but not limited to, the processing and payment of claims for prescription drugs, the performance of drug utilization review, the processing of drug prior authorization requests, the adjudication of appeals or grievances related to prescription drug coverage, contracting with network pharmacies, and controlling the cost of covered prescription drugs." (Bus. & Prof. Code, § 4430, subd. (j).)  As the U.S. Supreme Court has explained:  PBMs "are a little-known but important part of the process by which many Americans get their prescription drugs.  Generally speaking, PBMs serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use. When a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription, the pharmacy checks with a PBM to determine that person's coverage and copayment information.  After the beneficiary leaves with his or her prescription, the PBM reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment.  The prescription-drug plan, in turn, reimburses the PBM." (*Rutledge v. Pharmaceutical Care Management Assn.* (2020) ___ U.S. ___ [141 S.Ct. 474, 478].)

turn provide services to pharmacies in the OptumRx network. The relationships between OptumRx and the pharmacy service administrative organizations are governed by a "Provider Agreement" (Agreement).

In the trial court, OptumRx argued that, regardless of whether a pharmacy was served by a pharmacy service administrative organization, the pharmacy's contract with OptumRx included two instruments: (1) the "Provider Agreement" and (2) a "Provider Manual" (Manual). The pharmacies served by service administrative organizations disagreed that they were bound by those instruments. They alleged that after pharmacy service administrative organizations enter into Agreements with OptumRx, they recruit pharmacies into their networks that have no knowledge of the Agreements. They provided evidence that these pharmacies did not see, much less sign, the contracts between OptumRx and those organizations.

The trial court concluded that these pharmacies had no direct relationship with OptumRx under the Agreements and were thus not bound by them. OptumRx does not challenge this ruling on appeal and argues only that arbitration is compelled by the arbitration provisions found in the Manual.

The pharmacies alleged that once they contract with pharmacy service administrative organizations affiliated with OptumRx, the pharmacies are "given access to [OptumRx's] Provider Manual, which governs the terms of the relationship between [the pharmacies] and [OptumRx]. The Provider Manual functions as the contract, even though it is never signed by any Plaintiff." OptumRx has not provided a different account of how a pharmacy becomes bound by a Manual. Its senior director of network contracting attested that each pharmacy that belongs to OptumRx's network "has access to" the Manual online.

3

The Manual is updated "regularly." During the period covered by the complaint—2016 through 2020—the Manual was updated more than once per year, though this did not result in any changes to the arbitration provisions (with one significant exception described below). We focus primarily on the arbitration provisions as set forth in the 1st edition of the 2020 Provider Manual (effective January 1, 2020), which was attached to the pharmacies' complaint.

This version of the Manual is 155 pages long, including appendices. The six-page table of contents begins on page five of the Manual, and the fifth page of the table lists a section called "Alternative dispute resolution." That section begins on page 117 and spans about a page and a half. The section sets forth a process for the parties to "work in good faith" to resolve their disputes (other than with respect to issues giving rise to immediate termination or nonrenewal of the Manual). If the parties are unable to informally resolve their dispute, the dispute is to be submitted to binding arbitration under the American Arbitration Association's commercial dispute procedures. If the Manual's arbitration provisions conflict with these procedures, the Manual's provisions "will control." The arbitration must be held in Los Angeles or Orange Counties before a panel of three arbitrators, each having at least 10 years of legal experience in healthcare law.

Under the Manual, each party consents to a "documentary hearing" to be submitted to the arbitrators by written briefs, affidavits, and documents, or by oral hearing if any party requests one within 40 days after service of a claim. If a party has requested an oral hearing, within 21 days before the hearing, "the parties will exchange a final list of all exhibits, as well as all witnesses, including any designation of any expert witness(es) together with a summary of their testimony; [and] a copy of all documents to be introduced

at the hearing." If experts are designated by a party, the opposing party will be entitled to receive all information and documents relied on by the expert, to depose the expert, to designate a rebuttal expert witness, and to continue the hearing to allow the limited discovery to be completed.

Arbitrators have no authority to award anything other than actual damages. And the 2020 1st edition Manual provides that any dispute related to the parties' business relationship is to "be resolved on an individual basis so that no other dispute with any third party(ies) may be consolidated or joined with the Dispute." If an arbitrator allows class-action arbitration or requires a consolidated arbitration involving a third party, such decision would require "immediate judicial review."

The arbitration provisions contain a severability clause, which provides that "[i]n the event that any portion of this [arbitration] section or any part of this Agreement is deemed to be unlawful, invalid or unenforceable, such unlawfulness, invalidity or unenforceability shall not serve to invalidate any other part of this section or this Agreement."

Separate from the arbitration provisions, the 2020 1st edition of the Manual also contains what the trial court referred to as "self-help" options for OptumRx. The first appears in a section titled "Pharmacy payment," which provides that OptumRx will reimburse pharmacies for claims within 30 days. It also provides that pharmacies are subject to "penalties or sanctions" if OptumRx determines that a pharmacy disclosed confidential information to another OptumRx client or disrupted a relationship between OptumRx and another client. Such penalties "shall be invoked in amounts at a minimum of $5,000 per incident/per day; [and] may be subject to additional actions taken by [OptumRx], including and up to termination from participation, as well as withdrawal and/or the holding of funds as deemed necessary by [OptumRx]."

5

A different section of the 2020 1st edition of Manual describes OptumRx's "Pharmacy Audit Review Committee (PARC)," designed to ensure that pharmacies are in compliance with their pharmacy services agreement. As part of the committee's review process, OptumRx "has the right to assess reasonable fines, penalties and fees to cover unexpected costs," and OptumRx "may begin offset of audit finding amounts against any future payments due to [the pharmacy] and impose certain fines or penalties prior to the outcome of the PARC process." The Manual further provides that if a pharmacy breaches a provision of the agreement or OptumRx terminates the agreement, OptumRx, "to the fullest extent permitted by applicable law, . . . shall be entitled to withhold payment, impose penalties and other measures as it deems fit, including penalties to address lost profits."

The pharmacies sued OptumRx in September 2020. They alleged that OptumRx's "entire business model is grounded in a web of confidential agreements, that independent pharmacists such as Plaintiffs are never allowed to see, which [OptumRx] utilizes in an attempt to invoke preferential and discriminatory pricing favoring [OptumRx's] business allies (and Plaintiffs' direct competitors), and to apply a variety of other unfair and improper tactics." They alleged that OptumRx abuses its price-setting power to drive independent pharmacies out of business and that the company diverts business to its own mail-order pharmacy. The pharmacies alleged that OptumRx had "engaged in . . . blatant violations of its own contracts so that [it] can divert business that would otherwise go to local, independent pharmacies." One specific alleged breach was Optum's purported improper reimbursement for generic prescription drugs.

The pharmacies alleged causes of action for (1) violation of the California Uniform Commercial Code, (2) breach of contract (for allegedly

6

reimbursing pharmacies below what was required under the Manual), (3) breach of the covenant of good faith and fair dealing implied as a matter of law in the Manuals, (4) unfair competition in violation of Business and Professions Code section 17200 et sequitur, (5) unfair trade practices in violation of Business and Professions Code section 17045, (6) conversion, and (7) quantum meruit.

Less than a week after the pharmacies sued, OptumRx updated the 2020 4th edition of Provider Manual so that the arbitration provisions delegated issues of arbitrability to the arbitrator, but the company did not communicate the update to the pharmacies until December 2020. (Cf. *Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 61–62 [arbitration agreement in effect when claims accrued applies to dispute].) Nor did it assign a new number or edition to the Manual as it had done with prior updates (i.e., past practice suggested an updated manual would be called either Edition 4.1 or 5th Edition).

OptumRx filed a motion to compel arbitration. The company provided six versions of the Manual: the Manual in effect in 2016, 2017, 2018, and 2019; the third edition of the 2020 manual; and a version of the 2020 4th Edition Manual that the company claimed was in effect as of September 3, 2020. Relying on that fourth edition, OptumRx argued that the parties had clearly agreed that an arbitrator, and not the court, should decide issues of arbitrability.

The pharmacies opposed the motion. They argued that OptumRx had failed to satisfy its burden of proving the existence of a valid arbitration agreement. The pharmacies provided the declarations of 21 pharmacy representatives who all attested that they had never been provided with a Manual for review, signature, or acceptance, and they were unaware before

7

the lawsuit was filed that the Manual required that disputes be resolved by arbitration. The pharmacies further argued that the arbitration provisions in the various versions of the Manual were unenforceable because they were procedurally and substantively unconscionable.

The pharmacies also provided evidence that the version of the 2020 4th edition Manual that OptumRx provided was the version that had been changed after the pharmacies sued. In its reply brief, OptumRx stated it no longer relied on the updated version, including the arbitrability clause (at least not in this dispute). But as for the other versions of the Manual, OptumRx argued that the pharmacies "concede[d]" that they had "received copies" of them because they attached a complete copy of one version of the Manual to their complaint, "demonstrating they have access to the [Manual]." And it contended the pharmacies' claims that they were unaware of the Manual were "inconsistent with and barred by their judicial admission in the Complaint that the [Manual] is the parties' contract and that they had received a copy of it upon joining OptumRx's network."

Following a hearing, the trial court denied the motion to compel arbitration. It first ruled that the pharmacies were estopped from asserting that they were not parties to the Manuals because they had asserted claims for breach of contract based on them. But it then ruled that the arbitration provisions in those Manuals were procedurally and substantively unconscionable and thus unenforceable. The court also concluded that it could not sever the unconscionable terms from the agreement.

## II.
### DISCUSSION

*A. General Principles and the Standard of Review.*

The Federal Arbitration Act (FAA, 9 U.S.C. § 1 et seq.) provides that a written agreement to arbitrate "shall be valid, irrevocable, and enforceable,

8

save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) The FAA expresses favor for arbitration agreements. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 235 (*Pinnacle*).) "In determining the rights of parties to enforce an arbitration agreement within the FAA's scope, courts apply state contract law while giving due regard to the federal policy favoring arbitration." (*Id.* at p. 236.)

"The party seeking arbitration bears the burden of proving the existence of an arbitration agreement, and the party opposing arbitration bears the burden of proving any defense, such as unconscionability." (*Pinnacle, supra*, 55 Cal.4th at p. 236.) "The general principles of unconscionability are well established. A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party. [Citation.] Under this standard, the unconscionability doctrine ' "has both a procedural and a substantive element." ' [Citation.] 'The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. [Citations.] Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.' " (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125.) Both procedural and substantive unconscionability must be shown to establish the defense. (*Ibid.*)

The doctrine of unconscionability ensures that contracts, particularly those of adhesion, do not impose terms that are overly harsh, unduly oppressive, or are so one-sided as to shock the conscience. (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 910 (*Sanchez*).) It does not, however, encompass a simple bad bargain. (*Id.* at p. 911.)

9

"An evaluation of unconscionability is highly dependent on context." (*Sanchez*, *supra*, 61 Cal.4th at p. 911.) "The doctrine often requires inquiry into the 'commercial setting, purpose, and effect' of the contract or contract provision." (*Ibid.*) "[T]he substantive unfairness of the terms must be considered in light of any procedural unconscionability. The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement." (*Id.* at p. 912.) "The burden of proving unconscionability rests upon the party asserting it." (*OTO, L.L.C. v. Kho*, *supra*, 8 Cal.App.5th at p. 126.)

"Where, as here, the evidence is not in conflict, we review the trial court's denial of arbitration de novo." (*Pinnacle*, *supra*, 55 Cal.4th at p. 236.) We review the trial court's order denying arbitration and not its reasoning, affirming it if it is correct on any theory that may be found in the record. (*Ramos v. Westlake Services LLC* (2015) 242 Cal.App.4th 674, 686.)

### B. The Manuals' Arbitration Provisions Are Procedurally Unconscionable.

OptumRx first contends that the arbitration provisions of the Manual are not procedurally unconscionable, but we disagree.

"A procedural unconscionability analysis 'begins with an inquiry into whether the contract is one of adhesion.' [Citation.] An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power 'on a take-it-or-leave-it basis.' " (*OTO, L.L.C. v. Kho*, *supra*, 8 Cal.5th at p. 126.) OptumRx does not dispute in its opening brief that the Manuals containing the arbitration provisions are contracts of

10

adhesion.[2]  The question then becomes "whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required."  (*OTO, L.L.C. v. Kho*, *supra*, 8 Cal.5th at p. 126.)  " ' " '*Oppression* occurs where a contract involves lack of negotiation and meaningful choice, *surprise* where the allegedly unconscionable provision is hidden within a prolix printed form.' " ' "  (*Ibid.*)

The pharmacies' complaint alleged that OptumRx makes the "contractual arrangements" between the company and the pharmacies "as convoluted and opaque as possible."  The complaint further alleged that the pharmacies, as a practical matter, "have no choice but to deal with PBMs such as [OptumRx] in order to serve their customers, almost all of whom are . . . members" of prescription-drug benefit programs.  In opposing the motion to compel arbitration, the pharmacies contended that OptumRx's bargaining power was "vastly superior" to theirs, which "force[d] them to accept . . . onerous terms."  They had "no real choice but to contract with Optum, who controls access to their customers," the pharmacies argued.  They further contended that the arbitration provisions were "buried" in the Manual and included overly complex language that was opaque and

---

[2] It contends in its opening brief that the Manuals are not unconscionable simply because they are contracts of adhesion.  Then for the first time in its reply brief, OptumRx contends that the Manuals are not contracts of adhesion at all because they are incorporated by reference into each pharmacy's "*negotiated*" provider agreement it enters into with pharmacy service administrative organizations.  (Cf. *Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3 [points raised in reply brief for first time will not be considered absent showing of good reason not to present them before].)  The concurrence includes a detailed discussion of the relationship between independent pharmacies and pharmacy service administrative organizations.  (See *post*, conc. opn. of Banke, J.)  We, however, decline to consider OptumRx's undeveloped argument or to refer to information outside the record to do so.

sometimes inconsistent. Moreover, the Manual was "never formally provided" to them.

In support of these arguments, the pharmacies presented evidence that OptumRx's revenue in 2019 was more than $74 billion. The pharmacies submitted affidavits establishing that they, by contrast, earned an average (net) of no more than around $64,000 each month for the years 2016 through 2019, with most earning far less than that. In reply, OptumRx dismissed as "conclusory" allegations that OptumRx had a more powerful bargaining position.

The trial court's order denying arbitration focused only briefly on procedural unconscionability. The court noted that (1) the arbitration provisions started on page 119 under a section titled "Alternative Dispute resolution" and it was only when the reader turned to this page that the reader would discover the waiver to court access and trial by jury,[3] (2) the manuals were take-it-or-leave agreements, and (3) OptumRx asserted the right to unilaterally change the terms of the Agreements. Taken together, the trial court concluded, these were "collectively strong indications of procedural unconscionability."

On appeal, OptumRx focuses narrowly on the three factors highlighted by the trial court and argues why they do not establish procedural unconscionability. But again, we review the record de novo and affirm the trial court if it was correct on any legal theory found in the record. (*OTO,*

---

[3] It is unclear which version of the Manual the trial court was referring to. The arbitration provisions appear on page 119 of the version of the 2020 4th edition of the Manual that is no longer at issue. The version of the Manual attached to the pharmacies' complaint contained the same heading, though, and it appeared two pages earlier (on page 117).

*L.L.C. v. Kho, supra*, 8 Cal.5th at p. 126; *Ramos v. Westlake Services LLC*, *supra*, 242 Cal.App.4th at p. 686.)

It is undisputed that there was no negotiation or meaningful choice over the Manual (elements of oppression, see *OTO, L.L.C. v. Kho, supra*, 8 Cal.5th at p. 126) or that the pharmacies did not sign any version of the Manual. Were it not for the fact that the pharmacies alleged a cause of action for breach of contract, we may well conclude that OptumRx did not establish an agreement to arbitrate. The trial court concluded, and the pharmacies do not dispute, that they are equitably estopped from denying the applicability of the Manuals since they alleged a cause of action for breach of contract.[4]

Since the pharmacies concede the issue, we will assume that the pharmacies are equitably estopped from denying they are parties to the Manual. But we question whether the issue is as clear as the parties suppose. Courts have applied the doctrine of equitable estoppel to compel a signatory *plaintiff* to arbitrate with a nonsignatory *defendant* where the plaintiff's claims are dependent on or inextricably bound up with obligations imposed by a contract that the *plaintiff* has signed. (E.g., *JSM Tuscany, LLC v. Superior Court* (2011) 193 Cal.App.4th 1222, 1238–1239.) And courts have concluded that a nonsignatory plaintiff who alleges a breach of the contract "*may be* equitably estopped from repudiating the arbitration clause contained in that agreement." (*Id.* at p. 1239, italics added.) The rationale is that "no person can be permitted to adopt that part of a contract which is

---

[4] Given the lack of evidence that the pharmacies agreed to arbitrate, this court requested supplemental briefing on whether there was a valid agreement to arbitrate. In response, the parties reiterated their positions that the pharmacies were estopped from denying the existence of a valid agreement.

beneficial to him or her and simultaneously reject its burdens, including the burden to arbitrate." (*Id.* at p. 1240.)

Here, though, the pharmacies allege that OptumRx imposed the Manual on them through an opaque process that wholly favors OptumRx, and that OptumRx fails to reimburse them correctly even under the process laid out in the Manual. They alleged that "[a]s a practical matter, [the pharmacies] and other independent pharmacies have no choice but to deal with PBMs such as [OptumRx] in order to serve their customers," and that OptumRx's "entire business model is grounded on a wall of secrecy." If we view equitable estoppel more "as a shield to prevent injustice rather than a sword to compel arbitration" (see *Hirsch v. Amper Financial Services, LLC* (N.J. 2013) 71 A.3d 849, 852), we question whether non-signatory plaintiffs should necessarily be estopped from challenging arbitration provisions just because those provisions are part of instruments that the plaintiffs allege contain some contractual obligations.

But even assuming the pharmacies are estopped from denying that they were parties to the Manual, the manner in which the Manual was imposed on them weighs heavily in favor of finding procedural unconscionability based on oppression, because there was a lack of negotiation and meaningful choice. (*OTO, L.L.C. v. Kho, supra,* 8 Cal.5th at p. 126.) OptumRx contends that no such oppression was present because the pharmacies did not demonstrate "the absence of market alternatives." We are not persuaded.

It is true that "any claim of 'oppression' may be defeated if the complaining party had reasonably available alternative sources of supply from which to obtain the desired goods or services free of the terms claimed to be unconscionable." (*Dean Witter Reynolds v. Superior Court* (1989)

14

211 Cal.App.3d 758, 768.) Here, however, the pharmacies alleged that they had no choice but to deal with PBMs such as OptumRx since almost all of their customers were members of prescription-drug benefit programs.

OptumRx relies on the pharmacies' allegations that the company controls a quarter of the market share to suggest that the pharmacies necessarily had alternatives to dealing with it. But according to the complaint, "[i]f independent pharmacies such as Plaintiffs' decline to deal with [OptumRx], that means these pharmacies will not be able to serve a major portion of their customer base who are enrolled in health plans *whose drug benefits are managed by [Optum Rx].*" (Italics added.) In other words, if the pharmacies chose a PBM that controls part of the remaining 75 percent of the market, the pharmacies' businesses would suffer because they would not be able to access *any* of OptumRx's customers. It thus does not matter whether they can contract with another, or even multiple other, PBMs. As the pharmacies put it in their respondents' brief, "A consumer does not need more than one cell phone carrier, but a pharmacy needs customers from <u>all</u> the major PBMs. The only way an independent pharmacy can access the millions of customers whose pharmacy benefits are managed by Optum is to join Optum's network and agree to the terms of its ever-changing Provider Manual."

The cases upon which OptumRx relies are distinguishable. In two of them, the complaints at issue lacked *any allegations* that the plaintiff was unable to obtain the relevant services elsewhere. (*George v. eBay, Inc.* (2021) 71 Cal.App.5th 620, 625, 631–632 [no allegations that the plaintiff sellers lacked alternatives to the defendant global e-commerce platform], *Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1320 [plaintiff failed to allege he could not get merchant credit card from another source].) And in

15

*Dean Witter Reynolds v. Superior Court, supra*, 211 Cal.App.3d 758, there was no dispute that other financial institutions offered competing IRA's that the plaintiff could have selected instead of the defendant institution that charged what the plaintiff alleged to be illegal fees. (*Id.* at pp. 761, 768.) In another case relied on by OptumRx, the court found that the contract at issue was substantively unconscionable, but only to a "limited degree" since the plaintiff was a sophisticated contractor who used the services of the defendant crane service but also had done business with at least 10 other firms that provided the same services. (*Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc.* (2001) 89 Cal.App.4th 1042, 1056.)

Even the cases OptumRx cites that specifically involve contracts with PBMs do not help the company. In *Crawford Prof. Drugs, Inc. v. CVS Caremark Corp.* (5th Cir. 2014) 748 F.3d 249, a PBM network sought to compel arbitration when it was sued by locally owned drug stores in Mississippi. (*Id.* at p. 254.) The drug stores argued that the arbitration agreement was procedurally unconscionable under Arizona law, but the Fifth Circuit disagreed. (*Id.* at pp. 264–265.) The court held that it was insufficient for the plaintiffs to attest that the PBM "control[led] a significant percentage of [Mississippi's] prescription-filling business," since this did not establish that "there were no other PBMs with which they could contract or that it was not economically feasible to refrain from contracting with the Defendants at all." (*Id.* at p. 264.) Likewise in *Uptown Drug Co., Inc. v. CVS Caremark Corp.* (N.D.Cal. 2013) 962 F.Supp.2d 1172, the district court faulted the plaintiff for alleging only that it wanted to do business with the defendant because it was the largest PBM, but not that it had to do business with it or that it lacked a meaningful choice. (*Id.* at p. 1181.) Again, by contrast, the pharmacies here alleged that if they declined to work with

16

OptumRx they would be unable "to serve a major portion of their customer base who are enrolled in health plans whose drug benefits are managed by" OptumRx.

At oral argument, OptumRx's attorney argued that no evidence was presented below about OptumRx's share of the market and that remand was appropriate so that a factual record could be made. But whatever share of the market OptumRx commands, the main issue is that the pharmacies would not have access to any of OptumRx's customers if they did not do business with the company. As OptumRx does not seriously dispute this point, we do not consider remand to be necessary.

Focusing on the circumstances of the contract negotiation and formation also leaves us with little doubt that there was oppression due to unequal bargaining power, since the pharmacies had no input in the process and were not asked or expected to indicate their agreement with the Manual. (See *Pinnacle*, *supra*, 55 Cal.4th at p. 246.) OptumRx asserts that the Manuals "were provided to plaintiffs upon joining and were available to them at all times." But this "availability" appears to be a reference to the fact that the most recent versions of the Manuals are posted online. That the Manual is available to anyone with an internet connection hardly indicates a lack of oppression for purposes of evaluating procedural unconscionability.

OptumRx also contends that another element of procedural unconscionability, surprise, was absent because this was not a situation where the provision alleged to be unconscionable was hidden within a prolix printed form. (Cf. *OTO, L.L.C. v. Kho*, *supra*, 8 Cal.5th at pp. 126, 128.) But where, as here, " 'an adhesive contract is oppressive, surprise need not be shown.' " (*Nyulassy v. Lockheed Martin Corp.* (2004) 120 Cal.App.4th 1267, 1281.)

17

Having concluded that the arbitration provisions in the Manuals were procedurally unconscionable, we turn to consider whether they also were substantively unconscionable.

### C. *The Manuals' Arbitration Provisions Are Substantively Unconscionable.*

"Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided. [Citations.] A contract term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be 'so one-sided as to "shock the conscience." ' " (*Pinnacle, supra,* 55 Cal.4th at p. 246.)

We first address a factor the trial court relied on in concluding that the arbitration provisions were *procedurally* unconscionable—OptumRx's reservation of the right to unilaterally change the terms of the Manual without notice. Specifically, the 2020 1st edition provides, "While efforts are made to keep the information current, this [Manual] is subject to change without notice." The trial court concluded that this was one of many factors that were collectively "strong indications of procedural unconscionability." We agree with OptumRx that "whether the presence of a unilateral-modification clause is unconscionable is a question of *substantive* unconscionability." But unlike OptumRx, we conclude that the clause is substantively unconscionable.

We recognize that a party's reservation of the power to change the contract is not fatal if such power is subject to limitations such as the duty to exercise it in good faith and in accordance with fair dealings. (*24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 1214 (*24 Hour Fitness*).) But in the cases that have upheld these types of clauses, the party

18

opposing arbitration, unlike the pharmacies here, indicated their assent to—or at least knowledge of—the clause. In *24 Hour Fitness*, the plaintiff employee signed a personnel handbook " 'acknowledg[ing] that [defendant employer] reserves the right to change any provision in this Handbook at any time for any reason without advance notice.' " (*Id.* at p. 1213.) The acknowledgment further provided that if the employer made any material changes, it would provide a copy to the employee. (*Id.* at p. 1214.) Again, no such provision is included in the Manuals. And plaintiff pharmacists attested that, with two exceptions when two pharmacies said they were informed in March 2019 about a Manual revision, OptumRx otherwise did not inform them when a Manual was revised or what the revisions were. Like the Manual, notices of revisions apparently were posted online.

The pharmacies' lack of notice (or even knowledge) of the unilateral-modification clause distinguishes this case from the cases upon which OptumRx relies. In *Peng v. First Republic Bank* (2013) 219 Cal.App.4th 1462 (*Peng*), this court considered a written employment offer containing an arbitration agreement that the plaintiff employee had 25 days to consider and accepted after four days. (*Id.* at p. 1466.) *Peng* concluded that a provision of the agreement stating that the employer could unilaterally modify the agreement was not substantively unconscionable, following *24 Hour Fitness*'s rationale that the contract was subject to limitations of the employer acting with good faith and fair dealing. (*Peng*, at pp. 1473–1474.) In *Serpa v. California Surety Investigations, Inc.* (2013) 215 Cal.App.4th 695 (*Serpa*), also cited by OptumRx, the plaintiff employee received and signed a document acknowledging she had read the employee handbook containing an arbitration agreement and a clause giving her employer the right to revise the handbook at any time. (*Id.* at p. 700.) The appellate court concluded that

19

the clause was not substantively unconscionable because the employer was limited by the implied covenant of good faith and fair dealing in how it could alter the arbitration agreement. (*Id.* at p. 706.) Finally, the plaintiff in *Ashbey v. Archstone Property Management, Inc.* (9th Cir.) 612 Fed.Appx. 430 (*Ashby*) signed an acknowledgment making clear that he agreed to all the policies in an employment manual. (*Id.* at p. 432 (conc. opn. of Christen, C. J.).)

Moreover, in two of the cases OptumRx cites, the defendants were not alleged to have actually modified the relevant contracts (*Peng*, *supra*, 219 Cal.App.4th at p. 1474; *24 Hour Fitness*, *supra*, 66 Cal.App.4th at p. 1214, fn. 11), in one of them the defendant was not alleged to have unreasonably altered the relevant contract (*Ashbey*, *supra*, 612 Fed.Appx. at p. 432), and in the remaining case the issue was not specifically addressed (*Serpa*, *supra*, 215 Cal.App.4th 695). Again, here the pharmacies established that OptumRx modified the 2020 4th edition of the Manual after the pharmacies sued so that the arbitration agreement delegated issues of arbitrability to the arbitrator, and failed to promptly communicate the change. (Cf. *id.* at p. 708 [where agreement is silent as to notice, "implied in the unilateral right to modify is the accompanying obligation to do so upon reasonable and fair notice"].) The unilateral right to modify the Manual was a strong sign of substantive unconscionability, especially since the pharmacies were not given any opportunity to negotiate or agree to the Manual.

As for the factors the trial court relied on in finding substantive unconscionability, the court first focused on the "self-help" options available to OptumRx and concluded they "permit[ted] OptumRx to exercise self-help but require[d] the pharmacies to use the arbitration process." It found that

20

the arbitration provisions unreasonably limited discovery, and imposed a greater cost by requiring a panel of three arbitrators each with 10 years of experience in healthcare law and by prohibiting joinder of claims such that each plaintiff would have to pay the full cost of such a panel.[5]

OptumRx argues that the "self-help" provisions identified by the trial court "ha[d] nothing to do with the question of whether requiring the parties to arbitrate would be substantively unconscionable." To the contrary, the company's argument *supports* the trial court's conclusion. OptumRx contends that if it imposes a penalty on a pharmacy, the pharmacy can either agree that the penalty is appropriate and pay it, or it can proceed to arbitration where the pharmacy can dispute it. According to OptumRx, this arrangement does not limit a pharmacy's "opportunities" under the arbitration provisions because the pharmacy may still "proceed" to an arbitration where it may argue that the penalty was unwarranted. But that is precisely why dispute resolution under the Manuals is so one-sided: OptumRx may unilaterally obtain penalties without resorting to arbitration, while the pharmacies must resort to arbitration in order to challenge penalties. Depending on the penalty's size, resorting to arbitration before a three-arbitrator panel may not be worth the expense entailed. The issue is not, as OptumRx frames it on appeal, that the pharmacies lacked the same contractual remedies available to OptumRx. The issue is that OptumRx has an extrajudicial method to seek relief under the Manual, whereas the

---

[5] The trial court also found it substantively unconscionable that the arbitration provisions contemplated a documentary hearing, which would preclude live testimony and cross-examination. We agree with OptumRx that the provisions also provide the option for a live hearing with testimony from lay and expert witnesses. We thus focus on other factors.

pharmacies may only challenge such relief by resorting to a costly and time-consuming arbitration procedure.

OptumRx further contends that we may not focus on the penalty provisions identified by the trial court because they go to the alleged unconscionability of the entire agreement and not the arbitration provisions themselves. (See *Buckeye Check Cashing, Inc. v. Cardegna* (2006) 546 U.S. 440, 444–446 [challenge to entire agreement decided by arbitrator, while challenge to specific arbitration clause decided by courts].) While the self-help provisions identified by the trial court are outside the arbitration provisions, "the unconscionability of an arbitration agreement is viewed in the context of the rights and remedies that otherwise would have been available to the parties." (*Sanchez, supra*, 61 Cal.4th at p. 922.) The fact that OptumRx may engage in self-help while the pharmacies must arbitrate their claims is an indication of how one-sided the Manuals' dispute-resolution procedures are. (*Id.* at p. 910.)

In any event, the arbitration provisions are substantively unconscionable even ignoring the Manual's self-help provisions. To begin with, the costs contemplated by the arbitration provisions may be exorbitant for small, individual pharmacies. A requirement to arbitrate may be unconscionable where the party opposing arbitration shows that arbitration costs would be unaffordable or would have "a substantial deterrent effect" in the party's case. (*Sanchez, supra*, 61 Cal.4th at p. 920.) The pharmacies presented evidence that if each pharmacy were required to file an individual arbitration before a panel of three arbitrators, the initial filing fee would be $4,000, and the final filing fee would be $3,850. They provided further evidence that three-arbitrator panels cost almost four times as much in arbitrator compensation as those with a single arbitrator, and they provided

a declaration submitted in a previous matter indicating that one prior arbitration with OptumRx cost around $246,000 and another cost around $260,000. And again, the pharmacies submitted affidavits that most of them made no more than $64,000 each month, whereas OptumRx's revenue in 2019 was more than $74 billion. They attested that there was "no way" they could afford to pay what they understood would be $50,000 to $100,000 for an arbitration, and they could not afford to arbitrate the dispute individually.

OptumRx discounts this evidence as "conclusory statements unsupported by documentation or detail" and faults the pharmacies for "omit[ting] any discussion of [their net worth]." (E.g. *Wolf v. Langemeier* (E.D.Cal. Aug. 24, 2010, 2:09-CV-03086-GEB-EFB) 2010 U.S.Dist. Lexis 87017, *20 [because plaintiffs referred only to their monthly and annual incomes but not their net worth or monthly expenses, they failed to establish substantive unconscionability in costs of litigation].) OptumRx also claims that the evidence "indicates that monthly arbitration costs would be less than the monthly incomes of many of the plaintiffs—and thus are affordable," apparently suggesting that it considers arbitration to be affordable to a pharmacy so long as the costs do not exceed the pharmacy's monthly income. We are again mindful that "[a]n evaluation of unconscionability is highly dependent on context." (*Sanchez, supra*, 61 Cal.4th at p. 911.) Here, the context is that the arbitration provisions require arbitration before a costly three-member panel, where each panel member has at least 10 years of experience in healthcare law, while OptumRx may withhold penalties without itself having to resort to arbitration. OptumRx claims that the pharmacies "never account for the damages they expect to recover or the amount in controversy," without mentioning that the arbitration provisions

23

contemplate the award of only actual damages.  These are all indications of substantive unconscionability.

We also conclude that the arbitration provisions' limitations on discovery provide further evidence of  substantive unconscionability.  A provision in the 2020 1st edition Manual provides that 40 days after a claim for arbitration is filed, "the parties will exchange detailed statements setting forth the facts supporting the Claim(s) and all defenses to be raised during the arbitration and a list of all exhibits, as well as witnesses.  In the event any party requests an oral hearing, no later than twenty-one (21) days prior to the oral hearing, the parties will exchange a final list of all exhibits, as well as all witnesses, including any designation of any expert witnesses(es) together with a summary of their testimony; a copy of all documents to be introduced at the hearing."  If experts are designated, the opposing party shall receive all documents relied on by the expert and will be permitted to depose the expert.

Arbitration must have minimum standards of fairness, including discovery sufficient to arbitrate one's claims.  (*Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 719.)  True, an agreement need not require "the full panoply of discovery" otherwise provided under the Code of Civil Procedure.  (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 105–106 (*Armendariz*).)  But here the Manual contemplates little more than the equivalent of initial disclosures under the Federal Rules of Civil Procedure, as the trial court characterized the exchange of lists of information and witnesses to be relied on in the arbitration.

OptumRx describes the provisions as simply streamlining proceedings by "preclud[ing] . . . extensive prehearing discovery by way of document requests, interrogatories, and fact depositions."  But the 2020 1st edition

24

Manual does not just preclude *extensive* discovery, it appears to preclude requests for *any* type of compelled discovery, with the exception of expert discovery. This is far different from the arbitration agreement in *Sanchez v. Carmax Auto Superstores California, LLC* (2014) 224 Cal.App.4th 398, cited by OptumRx. There, the agreement at issue provided for the disclosure of relevant documents and production of an employee personnel file upon request, with each party entitled to 20 interrogatories and three depositions, with the possibility of additional discovery if the party demonstrated substantial need for it to an arbitrator. (*Id.* at p. 404.) Here, even if the pharmacies made a compelling showing of substantial need for discovery, there is no mechanism for securing it.

In its reply brief, OptumRx faults the pharmacies for relying on cases decided in the context of discovery involving employment law disputes, as opposed to contract claims. But according to the pharmacies, to prove their claims they need access to OptumRx's wholesale pricing data, which is solely in the company's possession. Arbitration provisions that foreclose the ability to compel this type of necessary information are substantively unconscionable, even in a commercial context.

Although both procedural and substantive unconscionability must be present to find an arbitration agreement unenforceable, "they need not be present in the same degree." (*Armendariz*, *supra*, 24 Cal.4th at p. 114.) Courts instead use a sliding scale, such that "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Ibid.*) Having found a high degree of procedural unconscionability, we conclude that the foregoing factors are sufficient indications of substantive unconscionability to find that the

arbitration provisions are unenforceable, without the need to analyze the additional factors relied on by the trial court.

   D. *The Trial Court Did Not Abuse Its Discretion by Declining to Sever Unconscionable Terms.*

OptumRx's final argument is that if this court agrees with the trial court that some of the arbitration provisions are unconscionable, only those provisions should be severed from the Manual, so that the enforceability of the remaining arbitration provisions is retained. We are again unpersuaded.

We agree with the trial court that "unconscionable terms permeate the agreement" and that we need not "rewrite the arbitration agreement by 'hacking off' offending provisions." (See *Armendariz*, *supra*, 24 Cal.4th at p. 122 [trial court has discretion whether to restrict unconscionable provision or refuse to enforce entire agreement].) Two factors weighing against severance that were present in *Armendariz* are present here. The "multiple defects indicate a systematic effort to impose arbitration on a[ weaker party] . . . as an inferior forum that works to [the stronger party's] advantage." (*Id.* at p. 124.) And since "there is no single provision a court can strike or restrict in order to remove the unconscionable taint from the agreement . . . , the court would have to, in effect, reform the contract, not through severance . . . , but by augmenting it with additional terms." (*Id.* at pp. 124–125.)

OptumRx claims it "would be simple, not impossible" to sever unconscionable terms from the arbitration provisions. And it identifies lines that could be stricken from various paragraphs of the Manual. We are not convinced. While we accept the parties' concession that the pharmacies are estopped from denying the existence of a contract, we are not required to pretend that the pharmacies ever negotiated or assented to the arbitration

26

provisions.  We are therefore disinclined to substitute one set of provisions that the pharmacies did not bargain for with another set, especially since the provisions are permeated with unconscionability.  (*De Leon v. Pinnacle Property Management Services, LLC* (2021) 72 Cal.App.5th 476, 493 [agreement permeated with unconscionability where there is more than one unlawful provision].)  And since the provisions contemplate such little discovery, they would have to be rewritten to *add* provisions for discovery, as opposed to striking unconscionable terms.  Under these circumstances, the trial court did not abuse its discretion in declining to sever unconscionable provisions.

III.
DISPOSITION

The trial court's order denying arbitration is affirmed.  Respondents shall recover their costs on appeal.

27

_____

Humes, P.J.


I CONCUR:


_____

Devine, J.*


*Judge of the Superior Court of the County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

_Platt, LLC et al. v. OptumRx, Inc._  A163061

**CONCURRING OPINION OF BANKE, J.**

I concur in the judgment, but write separately to describe more fully the unique context in which this case arises. In my view, this context does not permit ready application of some of the principles generally brought to bear in other arbitration cases.

*The Pharmaceutical Contracting Context*[1]

"Access to prescription drugs is an increasingly important—and expensive—benefit for a health care plan to offer its beneficiaries. Instead of themselves developing a list of covered prescription drugs, purchasing those drugs from pharmaceutical manufacturers, establishing a network of pharmacies to fill prescriptions, and otherwise administering the prescription drug benefit, many health care plans, including many [employee benefit plans (EBPs)], contract with a [pharmaceutical benefits manager (PBM)] to perform these functions. A PBM offers not just administrative convenience, however; by aggregating the purchasing power of numerous health care plans, a PBM can get greater volume discounts from drug manufacturers and provide access to a larger network of pharmacies than an EBP could do on its own. That the vast majority of insured Americans receive their pharmaceutical benefits through a PBM is, therefore, not surprising."

---

[1] To say the parties provided an abbreviated description of this contractual context is to be overly generous; they provided scant information. It also bears noting that while "the party seeking arbitration bears the burden of proving the existence of an arbitration agreement by a preponderance of the evidence, . . . the party opposing arbitration bears the burden of proving by a preponderance of the evidence any defense, such as unconscionability." (*Peng v. First Republic Bank* (2013) 219 Cal.App.4th 1462, 1468 (*Peng*).)

1

(*Pharmaceutical Care Management Association v. District of Columbia* (D.C. Cir. 2010) 613 F.3d 179, 183.)

Generally speaking, PBMs, such as defendant OptumRx, "serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use. When a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription, the pharmacy checks with a PBM to determine that person's coverage and copayment information. After the beneficiary leaves with his or her prescription, the PBM reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment. The prescription-drug plan, in turn, reimburses the PBM." (*Rutledge v. Pharmaceutical Care Management Assn.* (2020) __ U.S. __ [141 S.Ct. 474, 478] (*Rutledge*).) PBMs "operate," in other words, "as middlemen between pharmaceutical manufacturers, plan sponsors, pharmacies, and consumers—thereby negotiating drug discounts, setting drug prices, and reimbursing pharmacies." (*Trone Health Services, Inc. v. Express Scripts Holding Company* (8th Cir. 2020) 974 F.3d 845, 848 (*Trone Health*); see *Paduano v. Express Scripts, Inc.* (E.D.N.Y. 2014) 55 F.Supp.3d 400, 407 (*Paduano*).) "A patient's health insurance plan chooses which PBM covers their drug-related expenses." (*Park Irmat Drug Corp. v. Express Scripts Holding Co.* (8th Cir. 2018) 911 F.3d 505, 511 (*Park Irmat*).)

"PBMs create networks of pharmacies in which PBM members can receive their prescription pharmaceuticals at covered, discounted rates. To be successful, independent pharmacies must participate in the largest PBM networks. These independent pharmacies contract with PBMs either directly or through an agent such as a Pharmacy Services Administrative Organization (PSAO)." (*Park Irmat, supra,* 911 F.3d at p. 511.)

2

Thus, "[r]ather than negotiate these contracts with the PBMs themselves, many pharmacies—including roughly 80% of the 22,000 independent pharmacies in the United States—outsource this negotiation and other administrative tasks to PSAOs. . . ." (*Wholesale Alliance, LLC v. Express Scripts, Inc.* (E.D. Mo. 2019) 366 F.Supp.3d 1069, 1073 (*Wholesale Alliance*); see generally Feldman, *Designing Disruption in Pharmaceuticals* (2022) 28 B.U.J. Sci. & Tech. L. at p. 3 (*Designing Disruption*) [PSAO's "act as umbrella groups for many smaller, independent pharmacies, collectively leveraging their market share to negotiate contracts with PBMs and health plans"].) "With limited time and resources, independent pharmacies may need assistance in interacting with these entities [PBMs]. . . . Most use a PSAO to interact on their behalf." (GAO Report to Ranking Member, Committee on Energy and Commerce, House of Representatives, *Prescription Drugs: The Number, Role and Ownership of Pharmacy Services Administrative Organizations* (January 2013) at first introductory page (GAO Report).)

"PSAOs develop networks of member pharmacies by signing contractual agreements with individual pharmacies. These agreements set forth the duties and obligations of the PSAO to each pharmacy and vice versa, and generally authorize PSAOs to interact with third-party payers on behalf of the members in their network. Among the responsibilities established between the PSAO and the pharmacy, the PSAO is frequently given the responsibility to contract on behalf of the pharmacy with third-party payers." (GAO Report, *supra,* at p. 2.)

The "contract negotiation" services provided by PSAOs are pivotal and described in the GAO Report as follows: "On behalf of pharmacies, PSAOs may negotiate and enter into contracts with third-party payers or their

PBMs.  Both the HHS OIG [(Department of Health and Human Services, Office of Inspector General)] and an industry study reported that small businesses such as independent pharmacies generally lack the legal expertise and time to adequately review and negotiate third-party payer or PBM contracts, which can be lengthy and complex.  All of the model agreements between PSAOs and independent pharmacies that we reviewed indicated, and all of the PSAOs we spoke with stated, that the PSAO was explicitly authorized to negotiate and enter into contracts with third-party payers on behalf of member pharmacies.  By signing the agreement with the PSAO, a member pharmacy acknowledges and agrees that the PSAO has the right to negotiate contracts with third-party payers or their PBMs on its behalf." (GOA Report, *supra,* at pp. 15–16, fn. omitted.)

As of 2019, there were "22 PSAOs nationwide"[2]  (*Wholesale Alliance, supra,* 366 F.Supp.3d at p. 1073), and as of 2019, 83 percent of independent pharmacies were represented by PSAOs.  (*Designing Disruption, supra,* 28 B.U.J. Sci. & Tech. L. at p. 27, fn. 152; see generally GAO Report, *supra,* at pp. 2–3.)  By joining PSAOs, independent pharmacies gain entre to numerous PBM networks.  (GAO Report, at p. 18 [some PSAO-pharmacy model agreements required member pharmacies to "participate in all contracts in which the PSAO entered on behalf of members," other PSAOs "build a portfolio of contracts from which member pharmacies can choose"].)

"Most PSAOs charge a monthly fee for a bundled set of services and separate fees for additional services."  (GAO Report, *supra,* at p. 15;

---

[2]  PBMs can limit the number of PSAOs through which they will contract with independent pharmacies.  (See *Wholesale Alliance, supra,* 366 F.Supp.3d at pp. 1074, 1078–1079 [PBM narrowed PSAOs with which it contracted through request for proposal process].)

4

*Designing Disruption, supra,* 28 B.U.J. Sci. & Tech. L. p. 27, fn. 151.) "PSAO-pharmacy model agreements" also generally include "termination provisions that provide[] a member pharmacy the right to terminate the agreement—and thus leave the PSAO." (GAO Report, at p. 12, fn. 25.) Thus, "member pharmacies will change PSAOs whenever they think that another PSAO can negotiate better contract terms with third-party payers or their PBMs." (*Id.* at p. 12.)

PSAOs thus entered the pharmaceutical contracting chain "to assist pharmacies—particularly smaller, independent pharmacies—as they negotiate contracts with PBMs and health plans. The emergence of PSAOs represents a response to the extensive and convoluted agreements that underpin pharmacies' business with other players in the supply chain; many independent pharmacies lack the resources or wherewithal to handle these contracts on their own. PSAOs, representing a cohort of many pharmacies at once, can thus empower smaller firms within a consolidated pharmacy landscape." (*Designing Disruption, supra,* 28 B.U.J. Sci. & Tech. L. at p. 9, fns. omitted; see *ibid.* ["To keep afloat in the flood of paperwork and contracts that is the prescription drug supply chain, independent pharmacies have increasingly turned to PSAOs and [group purchasing organizations]"]; see generally GAO Report, *supra,* at pp. 12–18.)

As noted, the record before us contains scant information about the PSAOs plaintiffs joined. The record does reflect that OptumRx contracts with about a dozen PSAOs.[3] It negotiates directly with the PSAOs and not

---

[3] The number is closer to two dozen when one takes into account PSAOs that are part of a parent organization. For example, Cardinal Health's PSAO's have different brand names like Medicap, Leader Net, and Medicine Shoppe, and OptumRx contracts separately with these PSAOs.

with their pharmacy members. One of these PSAOs (namely Elevate, which is owned by AmerisourceBergen) "specifically bargained for the elimination of the arbitration clause from the template contract." Other than claiming "none of the terms" of their agreements with their PSAOs "were ever negotiated," plaintiffs provided no information about the PSAOs they joined or the terms of their agreements with their PSAOs.

PBMs, such as defendant OptumRx, have come under considerable criticism. The United States Supreme Court recently upheld state legislation enacted in response to claims "that the reimbursement rates set by PBMs were often too low to cover pharmacies' costs, and that many pharmacies, particularly rural and independent ones, were at risk of losing money and closing." (*Rutledge, supra,* 141 S.Ct. at pp. 478–479, 483.) And a number of lawsuits have been filed against PBMs alleging, under a variety of theories, and as plaintiffs do here, that these intermediaries have acted for the benefit of themselves and/or their own pharmacies,[4] to the detriment of the independent pharmacies in their networks. (E.g., *Trone Health, supra,* 974 F.3d at pp. 848–849 [suit against Express Scripts, then the "nation's largest PBM," alleging it used confidential patient data supplied by independent pharmacies to monopolize the market for the benefit of its own chain pharmacies, to the detriment of independent pharmacies]; *Park Irmat,*

---

[4] Some PBMs own or are directly affiliated with retail pharmacy chains. For example, CVS Health "includes CVS, one of the largest retail pharmacy chains, Caremark, one of the 'Big Three' PBMs, and Aetna, a major health insurer"—"a fact that has raised conflict of interest concerns." (*Disrupting Supply, supra,* 28 B.U.J. Sci. & Tech. L. at p. 3; see *Trone Health, supra,* 974 F.3d at p. 848 [Express Scripts, Inc., as of 2020, "the nation's largest PBM," has "a broad pharmacy network," including its own pharmacy service"]; *Park Irmat, supra,* 911 F.3d at p. 511 [as of 2018, CVS Health and another PBM, Express Scripts, "account[ed] for 65% of the PBM market"].)

6

*supra,* 911 F.3d at pp. 511–512, 514 [suit against Express Scripts, alleging "anticompetitive motives" and "bad faith" termination of pharmacy's network contract]; *Crawford Prof. Drugs, Inc. v. CVS Caremark Corp.* (2014) 748 F.3d 249, 255 [suit against CVS Caremark and CVS owned chain of pharmacies, alleging PMB used confidential patient data for the benefit of its own chain pharmacies to the detriment of independent pharmacies]; *Paduano, supra,* 55 F.Supp.3d at p. 407 [compounding pharmacies sued PBM for allegedly acting to drive independent compounding pharmacies from the market]; *Uptown Drug Co., Inc. v. CVS Caremark Corp.* (N.D.Cal. 2013) 962 F.Supp.2d 1172, 1176 (*Uptown*) [suit against CVS Caremark and CaremarkRx, alleging use of confidential patient data for the benefit of CVS-owned chain pharmacies to the detriment of independent pharmacies].[5])

While plaintiffs have made similar claims against OptumRx, another major PBM, they have not leveled any accusations or made any claims against their PSAOs.

*Procedural Unconscionability*

The majority identifies as a significant indicator of procedural unconscionability the fact plaintiffs had no access to the OptumRx Provider Manual prior to joining a PSAO and, thereby, the OptumRx pharmacy network. I am not persuaded this is so given the unique contractual context in which this case arises. As discussed above, PSAOs are the recognized

---

[5] Most of these cases have not been successful or the plaintiffs have been ordered to arbitrate their claims. (E.g., *Trone Health, supra,* 974 F.3d at p. 858 [affirming dismissal of claims]; *Park Irmat, supra,* 911 F.3d at p. 511 [affirming dismissal of claims]; *Crawford Prof. Drugs, Inc., supra,* 748 F.3d at p. 268 [affirming order compelling arbitration]; *Paduano, supra,* 55 F.Supp.3d at p. 437 [granting motion to compel arbitration]; *Uptown, supra,* 962 F.Supp.2d at p. 1176 [granting motion to compel in part].)

agents of independent pharmacies in negotiating contracts with PBMs. Indeed, that is one of the principal purposes of a PSAO—to take over the contracting function for, and on behalf, of its member pharmacies. (See *Wholesale Alliance, supra*, 366 F.Supp.3d at p. 1073 [PSAOs are "authorized to act on behalf of [their] affiliated pharmacies to negotiate network participation terms and conditions on the pharmacies' behalf"]; *Designing Disruption, supra,* 28 B.U.J. Sci. & Tech. L. at pp. 8–9; GOA Report, *supra*, at first introductory page ["PSAOs develop networks of pharmacies by signing contractual agreements with each pharmacy that authorizes them to interact with third-party payers on the pharmacy's behalf by, for example, negotiating contracts"].) Thus, in this unique contracting environment, that plaintiffs did not, themselves, have an opportunity to negotiate the terms of their relationship with OptumRx is an inapposite point. Plaintiffs delegated this function to their PSAOs.

The majority also identifies as an indicator of procedural unconscionability the 155-page length of the 2020 version of the Provider Manual and the fact the arbitration provision appears on page 117. Plaintiffs do not dispute that the manual governs *all* facets of the parties' relationship, and they do not identify any part of the manual that is excessively long or immaterial. The length of the document reflects, for better or worse, the complexity and exacting nature of the highly regulated pharmacy trade. The manual has a detailed table of contents that lists the "Alternative Dispute Resolution" provisions, which are readily located on turning to the specified page. These provisions are preceded by a separate "Alternative Dispute Resolution" heading in the same size font as other headings in the manual, and the text of these provisions are in the same size font as other provisions of the manual. However, neither the table of contents nor the textual

8

heading indicates "Alternative Dispute Resolution" includes arbitration, which would, of course, be clear if the table of contents and textual heading read "Dispute Resolution Procedures and Arbitration," and in the text, the subheadings "Dispute Resolution" and "Arbitration" appeared before the paragraphs relevant to each step. In addition, the page prior to the table of contents, entitled "About this Provider Manual (PM)," includes a bullet list of important points. This list could have included mention of the arbitration provision but did not. Thus, the *arbitration* provision is to some extent not readily apparent.

I also agree with the majority that plaintiffs made a sufficient showing the Provider's Manual is a contract of adhesion and a "take it or leave it" proposition but for a slightly different reason. Again, in my view given the unique contractual context, that plaintiffs did not, themselves, negotiate or sign any version of the manual is immaterial. Moreover, it is clear that a PSAO can exert enough strength in the bargaining process to achieve changes to OptumRx's standard contract, including to the arbitration provision. However, the GAO Report observed that "[o]ver half of the PSAOs" interviewed "reported having little success in modifying certain contract terms as a result of negotiations," commenting "[t]his may be due to PBMs' use of standard contract terms and the dominant market share of the largest PBMs." (GAO Report, *supra*, at p. 17.) And while OptumRx maintains plaintiffs did not make a sufficiently specific showing that they lack options to the OptumRx network, plaintiffs submitted evidence that OptumRx is the PBM for 25 percent of the market they serve. Both the 2013 GAO Report and the 2020 *Designing Disruption* law review article make it abundantly clear independent pharmacies need access to all significant PBM networks, such as

9

that of OptumRx, to stand a chance of surviving in the payment labyrinth that has become a hallmark of our current health care system.

In sum, while I do not share the majority's view that the arbitration provision is afflicted with profound procedural unconscionability, I do agree it suffers from at least a modicum of procedural unconscionability.

*Substantive Unconscionability*

The majority identifies as a mark of substantive unconscionability the fact OptumRx can make unilateral changes to the Providers Manual. However, the California courts have long held such a provision, in and of itself, does not render the contract substantively unconscionable. (E.g., *Peng, supra,* 219 Cal.App.4th at p. 1473; *24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 1213.) That is because the implied covenant of good faith and fair dealing, implied in *every* contract, restricts such changes to those that are reasonable and made in good faith. (*Id.* at p. 1214.)

Thus, the pertinent inquiry, *if* a unilateral change is made, is whether *that* change breaches the implied covenant of good faith and fair dealing. Plaintiffs focus on a change OptumRx made to the arbitration provision in mid-2020, pointing out it was made just after plaintiffs filed suit and claiming they did not receive notice of the change. The change followed a then-recent Court of Appeal decision that considered language purporting to reserve arbitrability to the arbitrator and holding the language ambiguous and not enforceable. The change made by OptumRx sought to bring the language of its arbitrability provision into line with that opinion. I am not persuaded that clarifying language an appellate court has held to be ambiguous is unreasonable or a bad faith exercise of the right to make unilateral changes. Nor, for all the reasons I have discussed, do I agree with the majority that the unilateral change provision is substantively

10

unconscionable "especially since the pharmacies were not given any opportunity to negotiate or agree to the Manual"—negotiating was the province of the PSAOs plaintiffs joined. (Maj. opn. *ante*, at p. 20.) In any case, OptumRx has disclaimed any reliance on the version of the Provider Manual containing the revised arbitration provision.

The majority also identify what plaintiffs call "self-help" provisions of the Providers Manual—provisions allowing OptumRx to take certain actions if it determines a pharmacy has violated provisions of the manual—as rendering the arbitration provision one-sided and thus substantively unconscionable. (Maj. opn. *ante*, at pp. 21–22.) The Providers Manual is replete with requirements with which network pharmacies must comply, as well as array of specified consequences for violation of those requirements. If OptumRx determines a pharmacy is in violation of these requirements and a contractual consequence is appropriate—which can range from terminating the pharmacy's participation in its pharmacy network, to holding back reimbursements, to assessing a contractual penalty—and the pharmacy *disagrees* that it is in violation and subject to a contractual sanction, a " 'Dispute' " thereby arises triggering the multi-step dispute resolution procedures, the last step of which is arbitration. I am not aware of any authority that suggests, for example, that a contract providing for the "self-help" remedy of termination thereby renders an arbitration provision in that contract substantively unconscionable. Rather, it is the decision to impose that contractual sanction that triggers the arbitration provision. That one of the contractual sanctions here is a "penalty," rather than outright termination of the relationship, is an immaterial distinction.

I do agree that plaintiffs have made a sufficient showing that mandatory use of three-member arbitration panels comprised of individuals

with 10 years of experience in healthcare law, regardless of the nature of the dispute, imposes a too burdensome level of costs. I also agree that the limitations on discovery are too rigid and do not afford plaintiffs the opportunity to request compelled discovery (other than with respect to expert discovery) should that be necessary.

In sum, while I do not agree with the majority that the arbitration provision is profoundly afflicted with unconscionability, I do agree that both procedural and substantive unconscionability are present, and the trial court properly reached the issue of whether severance is the appropriate remedy. (See *De Leon v. Pinnacle Property Management Services, LLC* (2021) 72 Cal.App.5th 476, 492 [" 'An agreement to arbitrate is considered "permeated" by unconscionability where it contains more than one unconscionable provision.' "].) We review a trial court's severance ruling only for abuse of discretion (*ibid.*), and I cannot conclude denial of severance was a manifest abuse of discretion.

I CONCUR:

_____
BANKE, J.

*Platt, LLC et al. v. OptumRx, Inc.*  A163061